# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MAYTOWN SAND AND GRAVEL LLC, | No. 46895-6-II |
| Respondent/Cross Appellant, | |
| v. | |
| THURSTON COUNTY, | |
| Appellant/Cross Respondent, | PUBLISHED OPINION |
| BLACK HILLS AUDUBON SOCIETY and FRIENDS OF ROCKY PRAIRIE, | |
| Additional Defendants, | |
| PORT OF TACOMA, a Washington special purpose district, | |
| Respondent/Cross Appellant. | |
| PORT OF TACOMA, a Washington special purpose district, | |
| Respondent/Cross Appellant, | |
| v. | |
| THURSTON COUNTY, | |
| Appellant/Cross Respondent, | |
| BLACK HILLS AUDUBON SOCIETY and FRIENDS OF ROCKY PRAIRIE, | |
| Additional Defendants, | |
| MAYTOWN SAND AND GRAVEL LLC, | |
| Respondent/Cross Appellant. | |

MELNICK, J. — Thurston County (County) appeals the trial court's orders denying its motions for summary judgment, judgment as a matter of law, and for a new trial, and the jury's verdict in favor of Maytown Sand and Gravel, LLC (MSG) and the Port of Tacoma (the Port).[1] Maytown's lawsuit against the County involved claims for tortious interference, negligence, negligent misrepresentation, and a violation of substantive due process[2] arising out of the County's interference with MSG's ability to begin gravel mining on property MSG had purchased from the Port. We conclude that the trial court did not err because neither the Land Use Petition Act (LUPA)[3] nor collateral estoppel barred the tortious interference claim, and MSG presented sufficient evidence of a substantive due process violation to avoid judgment as a matter of law.[4]

Maytown cross-appeals the trial court's order granting the County's motion in limine to exclude evidence of attorney fees as damages. Because the "American rule," which generally precludes a prevailing party from recovering attorney fees, does not apply to attorney fees incurred in a different proceeding that are claimed as damages, the trial court erred by granting the motion.

We affirm the jury's finding of liability and award of damages for the tortious interference claim, but remand solely on the issue of attorney fees as damages on Maytown's tortious interference claim.

---

[1] For clarity, we refer to Maytown Sand and the Port collectively as "Maytown." When referencing either individually, we will use "MSG" or "the Port."

[2] Under 42 U.S.C. § 1983. Only MSG alleged the substantive due process claim.

[3] Ch. 36.70C RCW

[4] Because of this conclusion, we do not consider the arguments on the negligence or the negligent misrepresentation claims.

FACTS

I. FACTUAL BACKGROUND

    A. GRAVEL MINE PROPERTY

The Port owned property in Thurston County. The property had a final, vested special use permit (SUP) that the County had issued to the Port in January 2006. The SUP allowed gravel mining on the property if certain conditions were satisfied. The SUP had a 20-year duration from the date mining began and included a mandatory review by a hearing examiner every five years.

The SUP included explicit preconditions before mining could begin. In particular, condition 6 required the permittee to adhere to the "Maytown Aggregates Groundwater Monitoring Plan." Condition 6A required field verification of off-site supply wells within a year of the SUP issuing. Condition 6C required installation of 17 monitoring wells to check on water levels, water temperature, and water quality. The monitoring was to begin within 60 days of the SUP's issuance. The Port did not comply with these deadlines.

    B. DISCUSSIONS BEFORE PURCHASE

In 2009, MSG became interested in purchasing the property from the Port. MSG wanted to develop and operate a gravel mine on the property.

In October, the owners of MSG and their attorney, John Hempelmann, met with Mike Kain, the County's Resource Stewardship Department planning manager. Kain told MSG that the SUP was valid, and that "minor staff approvals and things . . . needed to be done."[5] 10 Report of Proceedings (RP) at 2148. He further stated that after MSG filed an application for amendments, the staff would handle them administratively. According to MSG, Kain stated that the SUP had

---

[5] A few of the conditions required amendments because the Port failed to complete them within the time requirements listed in the SUP.

no "skeletons in the closet," and it could be mining within 30-60 days. 10 RP at 2227. Kain denied making this statement.

After this meeting, MSG and the Port entered into a purchase and sale agreement on the property. MSG agreed to pay $17 million to purchase the property.

In December, Kain e-mailed MSG and informed it of its lack of compliance with the conditions of the SUP. The e-mail stated that staff could approve minor amendments to the SUP, but major amendments would need approval by a Thurston County Hearing Examiner.

On February 16, 2010, Kain sent Maytown a memorandum outlining its compliance status with each of the SUP's conditions. When referencing a condition that required a minor timeline change, Kain stated it "may be approved by staff upon submittal of an application for amendment." Ex. 62, at 5. The document provided that "it is the staff assessment that the applicant is substantially in compliance with the conditions of [the State Environmental Policy Act of 1971] SEPA and the SUP at this time." Ex. 62, at 22.

On April 1, MSG and the Port closed on the purchase and sale agreement for the property. MSG made a $1 million down payment to the Port.

C.     REQUEST FOR SUP AMENDMENTS

In late April, MSG requested eight amendments to the SUP, including condition 6.[6] Specifically, MSG requested an amendment of the missed deadlines in conditions 6A and 6C and

---

[6] MSG requested to amend six SUP conditions relating to timing, extent, and notification requirements on the water monitoring issue, and amendments related to the freeway turn-pocket and the removal of a noise berm. The Port worked closely with MSG throughout the process.

4

the elimination of the background testing required in condition 6C.[7]  Because it only asked for minor amendments, MSG asked the County to process the amendments administratively.

Kain wrote to Maytown's lawyers that after County staff reviewed the application for amendments, they determined the amendments were major and required hearing examiner approval.  County staff also planned to require SEPA review of the already issued "Mitigated Determination of Non-Significance" (MDNS) for the SUP.  MSG appealed the County's decision to a hearing examiner and challenged the need to conduct a SEPA review.

MSG withdrew some of the proposed amendments in an effort to have the remaining amendments classified as minor.  It did not withdraw the amendments to conditions 6A and 6C, which Kain had labeled in his February memorandum as minor timeline changes to be approved upon application for amendments.

On June 17, Kain informed Maytown that the requested amendments could not be addressed at the administrative level and would be deemed major, which meant that they would be referred to a hearing examiner for a decision.  Hempelmann said that Kain told him that the attorney for the Board of County Commissioners (BOCC) directed Kain to label MSG's requested amendments as major.

---

[7] On July 1, MSG withdrew its request to eliminate the background testing required in condition 6C.

In April 2011, the Hearing Examiner issued a decision on the SUP amendment requests.[8] The Hearing Examiner approved the SUP amendment application, which the County supported, and adopted Maytown Sand's water monitoring plan to replace the 2005 groundwater monitoring plan and conditions 6A and 6C. The Hearing Examiner did not approve any other amendments.

D.     FIVE YEAR REVIEW HEARING

In 2010, the County's Resource Stewardship Department issued a summary report on MSG's pending five year review. The report expressed an opinion that because no land disturbing activity had yet occurred, the new 2009 critical area ordinance (CAO) should apply.[9] The County took this same position before the Hearing Examiner at the five year review hearing. The report stated that complying with the new critical area ordinance would likely reduce the mining area, potentially by 100 acres.

The Hearing Examiner conducted the five year review hearing in December 2010. The Hearing Examiner issued a written decision at the end of the month. In its findings of fact, the Hearing Examiner stated that:

> The County asserted that entire site should be re-reviewed for compliance with new codes every five years. In the alternative, the County argued that if the interim CAO provisions are held not to apply to the mine, the entire [property] should be studied for critical areas that currently meet or in 2002 would have met the 2002 CAO definitions and that any areas determined to be critical areas in those studies should be excluded from the mine boundary.

---

[8] The Hearing Examiner combined this review with MSG's appeal of the need for SEPA review. The Hearing Examiner determined that MSG successfully proved that the proposed amendments to the water monitoring conditions would not impact the environment. Accordingly, the Hearing Examiner concluded that SEPA review was "superfluous" because it was not considered an action under SEPA. Ex. 127, at 31.

[9] Roy Garrison, an expert witness before the Hearing Examiner, testified at trial about his involvement in studying the property for the Port after the County issued the permit. Garrison opined that this was the first instance of a county seeking to apply new critical areas regulations to an existing permitted mine.

Ex. 11, at 30. The Hearing Examiner concluded this interpretation of the Thurston County Code, "would have the same effect as requiring mines to re-apply every five years," and that "credible evidence supports the conclusion that no critical areas that should have been protected pursuant to the 2002 CAO were missed." Ex. 11, at 46. The Hearing Examiner granted the five year review subject to minor conditions. "The Applicant has demonstrated compliance with all conditions except MDNS 6.A, 6.C, and 10. Compliance with those conditions can be ensured by new conditions of approval." Ex. 11, at 47.

Friends of the Rocky Prairie (FORP) and the Black Hills Audubon Society (BHAS), groups opposed to the mine, appealed the Hearing Examiner's decision to the BOCC, arguing that the BOCC should reverse the decision in its entirety.

Commissioners Sandra Romero, Karen Valenzuela, and Cathy Wolfe comprised the BOCC. Commissioners Romero and Valenzuela belonged to and were donors of BHAS. Generally, the BOCC commissioners became involved in a permit only if it was appealed to them from the Hearing Examiner. The commissioners did not direct the staff on permit issues. However, the BOCC directed staff in this case to continue to determine whether the permit was "considered active" or valid because the property had not been used for mining yet.[10] 15 RP at 3042.

---

[10] At trial, two County staff members, Cliff Moore and Donald Krupp, testified that the BOCC did not pressure County staff on the request for amendments. The BOCC did not try to invalidate the permit or delay MSG from starting to mine. County staff did not recall any evidence of "missed critical areas" or why the permit should have been held up for additional studies. 14 RP at 2976. The County communicated with Sharon Coontz of FORP about any progress made by MSG on the SUP, but it did not inform Maytown about those communications.

Each of the commissioners conducted private meetings with Sharon Coontz, FORP's representative, about the SUP and the property. However, Coontz denied conspiring with the commissioners to "kill" or "delay" the mine. 17 RP at 3396.

Romero did not disclose her membership in BHAS or her frequent correspondence with Coontz about the SUP to Maytown. After a BOCC meeting and learning about FORP's position from Coontz, Romero expressed interest in submitting a written request to open the SEPA review process for the SUP.

Valenzuela also had meetings with Coontz about the SUP, but did not inform Maytown of those meetings. In particular, Valenzuela invited Coontz, but not Maytown, to attend a BOCC meeting to explain why FORP believed the SUP was illegal. Valenzuela told the County staff that she wanted "strict adherence to SEPA" because it was "meaningful" to her that BHAS objected to the requested amendments to the SUP.[11] 8 RP at 1701. Valenzuela also signed a petition to rezone part of MSG's property.

Commissioner Wolfe denied ever directing staff on a permit issue. She did meet with Coontz about Maytown once.

On March 3, 2011, the BOCC heard the appeal by FORP and BHAS. During the BOCC hearing, Romero disclosed that she was "sympathetic" to FORP during her election, but said she could make a "fair and impartial decision." 9 RP at 1904. When asked to declare that she could fairly and impartially judge the case, Valenzuela did not disclose any of her communications with

---

[11] At trial, Valenzuela testified that she did not know it was illegal for the County to seek to apply a new ordinance to an already permitted mine. She was impeached by her own deposition testimony that she knew at the time the BOCC issued the decision that new ordinances did not apply retroactively. Valenzuela also testified that she directed the County to argue the 2009 CAO should apply.

FORP or her membership in BHAS. None of the commissioners disclosed their meetings with Coontz about the property on the record.

> The BOCC affirmed the Hearing Examiner, but determined that the
>
> matter shall be remanded back to the hearing examiner for purposes of determining whether critical areas, as specified below, and as defined in the 2002 CAO, are protected within the mine area. . . . If the hearing examiner determines that the supplemental habitat management plan reveals the above identified jurisdictional critical areas, the final site plan shall be amended to delineate the jurisdictional critical areas and their buffers before mining can commence. The hearing examiner shall also determine whether or not any other conditions need to be amended or added as a result of the supplemental habitat management plan.

Ex. 7, at 5.

According to Valenzuela, before the hearing on the five year review, the BOCC did not have verifiable facts to support the County's suspicion that critical areas were missed, and the staff repudiated Coontz's statement that there were streams on the property (critical areas) for months. Wolfe knew the Hearing Examiner had found that the critical areas were studied thoroughly in 2002 through 2005, but she remanded the case to "ask[ ] the Hearing Examiner to look at anything that could have happened, since that decision was made, because there were indications of new vegetation." 18 RP at 3658.

## II.    PROCEDURAL FACTS

MSG filed a LUPA petition in Lewis County Superior Court appealing the BOCC's decision requiring a remand.[12] In the alternative, it petitioned for declaratory judgment and constitutional writ, injunctive relief, and a complaint for damages against Thurston County for a review of a land use decision made by the County pursuant to LUPA.[13]

---

[12] The Port was listed as an "Additional Party" for this petition. 1 Clerk's Papers (CP) at 1.

[13] Ch. 36.70C RCW; ch. 64.40 RCW.

The trial court granted summary judgment on Maytown's LUPA petition and reinstated the Hearing Examiner's decision from December 30, 2010.[14] The trial court also ruled that the disposition of the LUPA petition did not render Maytown's complaint for damages moot.

Maytown filed an amended complaint for damages. The amended complaint asserted the same causes of action as the original complaint: negligence, negligent misrepresentation, tortious interference with a business expectancy, and violations of chapter 64.40 RCW and 42 U.S.C. § 1983. The complaint excluded the LUPA petition because Maytown deemed the issue resolved.

The tortious interference with a business expectancy claim alleged that Maytown had a business relationship or expectancy with a probability of future economic benefit, the County knew of the expectancy and improperly and intentionally induced or caused the termination of the expectancy, and caused damages to Maytown. MSG's substantive due process claim under 42 U.S.C. § 1983 alleged that while acting under color of state law, the BOCC actions deprived MSG of its valuable property right (the SUP) without due process, and MSG was entitled to damages and attorney fees under 42 U.S.C. § 1988 as a result.

The County filed an answer and counterclaim to Maytown's amended complaint. The County pleaded some affirmative defenses and defenses, including that some or all of the claims were barred by statutes of limitations, failure to exhaust remedies, lack of standing, res judicata and/or collateral estoppel, and immunity. In addition, the County alleged that Maytown did not suffer compensable damages.

---

[14] MSG began mining in November 2011. On October 8, 2012, the Port sent MSG a notice of default under the real estate contract.

### A.   County's Motion for Summary Judgment On All Claims

The County filed a motion for summary judgment on all claims. The trial court heard arguments on the County's motion for summary judgment and denied the motion.

### B.   Maytown's Motions for Partial Summary Judgment

#### 1.   Arbitrary and Capricious Acts

Maytown filed a motion for partial summary judgment seeking a finding of liability by the County for "arbitrary and capricious actions and for knowingly unlawful actions." 4 CP at 1413, 1767. The trial court granted Maytown's motion for partial summary judgment, concluding that the BOCC's actions were arbitrary and capricious. It also denied the County's motion for summary judgment.

#### 2.   MSG's Motion on Substantive Due Process Claims

MSG filed another motion for partial summary judgment on the County's violations of MSG's substantive due process rights. The County also cross-moved for summary judgment. The trial court denied both motions because disputed issues of material facts existed.

### III.   Trial

### A.   Motions in Limine

In its motions in limine, the County sought to exclude testimony and argument for any attorney fees sought as damages because the American rule[15] prohibited such evidence.

Maytown sought to introduce evidence at trial of the attorney fees they spent defending against the actions of the County staff and the BOCC. Maytown argued that the American rule did not preclude such damages. The trial court granted the County's motion in limine.

---

[15] Washington follows the American rule, which provides that generally each party in a civil action will pay its own attorney fees and costs. *Cosmopolitan Eng'g Grp., Inc. v. Ondeo Degremont, Inc.*, 159 Wn.2d 292, 296, 149 P.3d 666 (2006).

Maytown filed a supplemental brief on the issue of attorney fees as damages. Maytown explained that they only sought recovery of the attorney fees spent to protect the validity of the SUP, fees that were the proximate and foreseeable result of the County's tortious acts.

The trial court entered a written order granting the County's motion in limine and excluded evidence of attorney fees as damages.

### B.    COUNTY'S MOTIONS FOR JUDGMENT AS A MATTER OF LAW

At the close of Maytown's case-in-chief, the County moved for judgment pursuant to CR 50 on all of Maytown's claims. The trial court denied the motion because factual disputes needed to be resolved.

At the close of the County's case, the County renewed its motion for judgment on all of Maytown's claims. The trial court denied the motion.

### C.    VERDICT AND JUDGMENT

The jury found in favor of Maytown. By special verdict, the jury found that the County tortuously interfered with the contract between MSG and the Port and MSG's business expectancy, the County made negligent misrepresentations to Maytown, the County was negligent, and the County, acting through the BOCC, violated MSG's substantive due process rights. Based on the special verdict form, the damages awarded by the jury could have been based solely on finding the County liable for one tort claim. The jury awarded $8 million to the Port and $4 million to MSG. The jury also found that MSG owed the County money for unpaid permit fees, and awarded the County $63,000. The trial court entered the judgment.

IV.      Post-Trial Motion for Judgment as a Matter of Law or a New Trial

The County filed a motion for judgment as a matter of law pursuant to CR 50(b) or in the alternative for a new trial or amendment of judgment under CR 59(a)(5), (6), (7), (8), (9) and/or RCW 4.76.030. The trial court filed a written order denying the County's motions.

The County appealed, and Maytown cross appealed.

ANALYSIS

I.      Standard of Review

The County seeks review of the trial court's denial of multiple different motions throughout the pretrial, trial, and post-trial proceedings. We review an order for summary judgment de novo, engaging in the same inquiry as the trial court. *Jones v. Allstate Ins. Co.*, 146 Wn.2d 291, 300, 45 P.3d 1068 (2002). We also review a trial court's denial of a CR 50 motion for judgment as a matter of law de novo, engaging in the same inquiry as the trial court. *Schmidt v. Coogan*, 162 Wn.2d 488, 491, 173 P.3d 273 (2007). "Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party." *Sing v. John L. Scott, Inc.*, 134 Wn.2d 24, 29, 948 P.2d 816 (1997). "'Substantial evidence' is evidence sufficient to persuade a fair-minded, rational person that the premise is true." *Hawkins v. Diel*, 166 Wn. App. 1, 13, 269 P.3d 1049 (2011). Finally, we review a denial of a new trial based on CR 59 an issue of law de novo. *Mears v. Bethel Sch. Dist. No. 403*, 182 Wn. App. 919, 927, 332 P.3d 1077 (2014), *review denied*, 182 Wn.2d 1021 (2015).

The issues raised by the County at each stage of the proceedings were decided by the trial court as a matter of law. Therefore, we review all of the issues de novo.

II.     TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

The County argues that the trial court erred by denying its motions for summary judgment, judgment as a matter of law, and for a new trial because LUPA barred Maytown's claim of tortious interference with a business expectancy and that they failed to exhaust their administrative remedies. The County also argues that collateral estoppel barred the tortious interference claim. We disagree.[16]

A.     ELEMENTS

> A party claiming tortious interference with a contractual relationship or business expectancy must prove five elements: "(1) the existence of a valid contractual relationship or business expectancy, (2) that defendants had knowledge of that relationship, (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy, (4) that defendants interfered for an improper purpose or used improper means, and (5) resultant damage."

*Pac. Nw. Shooting Park Ass'n v. City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006) (quoting *Leingang v. Pierce County Med. Bureau, Inc.*, 131 Wn.2d 133, 157, 930 P.2d 288 (1997)).

B.     LUPA

The County argues that the trial court erred by refusing to dismiss the tortious interference claim because LUPA barred it. We disagree.

---

[16] Maytown asserted tort claims for tortious interference with a business expectancy, negligent misrepresentation, and negligence. But the special verdict form asked the jury to determine damages if the jury found for Maytown on any of the tort claims. Because we conclude that sufficient evidence supported the jury's verdict in favor of Maytown on tortious interference, we need not address the negligent misrepresentation and negligence claims.

1.    STANDARD OF REVIEW

LUPA is generally the exclusive remedy for land use decisions.  RCW 36.70C.030(1).

Under LUPA, a superior court may grant relief from a land use decision only if the party seeking

relief has shown:

> (a) The body or officer that made the land use decision engaged in unlawful procedure or failed to follow a prescribed process, unless the error was harmless;
> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;
> (d) The land use decision is a clearly erroneous application of the law to the facts;
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision; or
> (f) The land use decision violates the constitutional rights of the party seeking relief.

RCW 36.70C.130(1).  "A superior court hearing a LUPA petition acts in an appellate capacity and

has only the jurisdiction conferred by law." *Durland v. San Juan County*, 182 Wn.2d 55, 64, 340

P.3d 191 (2014).  RCW 36.70C.020(2) defines a land use decision as "a final determination by a

local jurisdiction's body or officer with the highest level of authority to make the determination,

including those with authority to hear appeals, on: (a) [a]n application for a project permit."

However, the legislature provided for certain exemptions to LUPA's application.  *James*

*v. Kitsap County*, 154 Wn.2d 574, 583, 115 P.3d 286 (2005).

This issue raises questions of statutory interpretation, which we review de novo.  *Tingey v.*

*Haisch*, 159 Wn.2d 652, 657, 152 P.3d 1020 (2007).

### 2. LUPA DOES NOT BAR THE TORTIOUS INTERFERENCE CLAIM

Washington courts have made it clear that LUPA does not apply to "[c]laims provided by any law for monetary damages or compensation." RCW 36.70C.030(1)(c); *see also Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 296 P.3d 860 (2013); *Woods View II, LLC v. Kitsap County*, 188 Wn. App. 1, 352 P.3d 807, *review denied*, 184 Wn.2d 1015 (2015); *Libera v. City of Port Angeles*, 178 Wn. App. 669, 316 P.3d 1064 (2013). RCW 36.70C.030 specifically exempts claims for monetary damages from land use decisions.

In *Lakey*, the appellants sought monetary compensation rather than a reversal of a land use decision. 176 Wn.2d at 926. The appellants alleged a taking by the local government, but did not challenge the taking in a LUPA action. *Lakey*, 176 Wn.2d at 925. Instead, the appellants filed a separate action for their inverse condemnation claim. *Lakey*, 176 Wn.2d at 926. The *Lakey* court held that LUPA provides for judicial review of a local jurisdiction's land use decision, but the appellants made a claim they were unable to raise before a hearing examiner, and did not invoke the superior court's appellate jurisdiction. 176 Wn.2d at 927-28. Consequently, LUPA did not bar their claim. *Lakey*, 176 Wn.2d at 928.

In *Woods View II*, the plaintiffs brought an action against Kitsap County alleging multiple tort claims. 188 Wn. App. at 18. The County argued that the plaintiff's failure to bring an action under LUPA barred any damages actions arising from its permitting activity. *Woods View II*, 188 Wn. App. at 24. We held that where a claim did not challenge the actual land use decision, but instead sought damages for the delay in rendering those decisions, LUPA did not bar the claim. *Woods View II*, 188 Wn. App. at 25.

Similarly, in *Libera*, we concluded that LUPA did not apply because the appellant appealed dismissal of "only his damages claim for intentional interference with business expectancy by government delay." 178 Wn. App. at 676 n.6.

Here, the portion of the Hearing Examiner's April 2011 decision that discussed the procedure for amendment review by the County was not a land use decision. Maytown sought monetary damages for tortious interference. They did not seek judicial review of the land use decision. The original complaint included a request for review of the LUPA action, but after the trial court granted Maytown's summary judgment motion under LUPA, only a complaint for damages remained.

Therefore, because the tortious inference claim for monetary damages did not constitute a challenge to the land use decision, LUPA did not bar it. Accordingly, we hold that LUPA does not apply, and the trial court did not err by determining LUPA did not bar the tortious interference claim.

C.    COLLATERAL ESTOPPEL

The County also argues that the trial court erred by refusing to dismiss the tortious interference claim because it was barred by collateral estoppel. We disagree.

1.    STANDARD OF REVIEW

We conduct de novo review on whether collateral estoppel applies to bar relitigation of an issue. *State v. Vasquez*, 109 Wn. App. 310, 314, 34 P.3d 1255 (2001).

"'The doctrine of collateral estoppel is well known to Washington law as a means of preventing the endless relitigation of issues already actually litigated by the parties and decided by a competent tribunal.'" *Hadley v. Maxwell*, 144 Wn.2d 306, 311, 27 P.3d 600 (2001) (quoting *Reninger v. Dep't of Corrs.*, 134 Wn.2d 437, 449, 951 P.2d 782 (1998)). It is distinguished from

claim preclusion, or res judicata, "'in that, instead of preventing a second assertion of the same claim or cause of action, it prevents a second litigation of *issues* between the parties, even though a different claim or cause of action is asserted.'" *Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983) (emphasis added) (quoting *Seattle First Nat'l Bank v. Kawachi*, 91 Wn.2d 223, 225-26, 588 P.2d 725 (1978)). But, "[c]ollateral estoppel is not a technical defense to prevent a fair and full hearing on the merits of the issues to be tried." *Hadley*, 144 Wn.2d at 311. "'Washington courts focus on whether the parties to the earlier proceeding had a full and fair hearing on the issue.'" *Hadley*, 144 Wn.2d at 311 (quoting *Neff v. Allstate Ins. Co.*, 70 Wn. App. 796, 801, 855 P.2d 1223 (1993)).

We apply a four-part test to analyze whether a previous litigation should have a collateral estoppel effect on a subsequent litigation. *Hadley*, 144 Wn.2d at 311. Collateral estoppel requires:

> "'(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.'"

*Hadley*, 144 Wn.2d at 311 (quoting *Southcenter Joint Venture v. Nat'l Democratic Policy Cmty.*, 113 Wn.2d 143, 148, 780 P.2d 1282 (1989) (quoting *Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987))). If we find that any element is not satisfied, we need not address the others. *Hadley*, 144 Wn.2d at 311.

> [A]pplication of collateral estoppel is limited to situations where the issue presented in the second proceeding is *identical in all respects* to an issue decided in the prior proceeding, and "where the controlling facts and applicable legal rules remain unchanged." Further, issue preclusion is appropriate only if the issue raised in the second case "involves substantially the same bundle of legal principles that contributed to the rendering of the first judgment," even if the facts and the issue are identical.

*LeMond v. Dep't of Licensing*, 143 Wn. App. 797, 805, 180 P.3d 829 (2008) (emphasis added) (citation and internal quotation marks omitted) (quoting *Standlee v. Smith*, 83 Wn.2d 405, 408, 518 P.2d 721 (1974)).

"Decisions of administrative tribunals may have preclusive effect under Washington law." *Reninger*, 134 Wn.2d at 449. An administrative decision may have preclusive effect on a later civil action where the parties had ample incentive to litigate issues. *Thompson v. Dept. of Licensing*, 138 Wn.2d 783, 796, 982 P.2d 601 (1999); *Reninger*, 134 Wn.2d at 437. "Three additional factors must be considered under Washington law before collateral estoppel may be applied to agency findings: (1) whether the agency acted within its competence [made a factual decision], (2) the differences between procedures in the administrative proceeding and court procedures, and (3) public policy considerations." *Christensen v. Grant Cty. Hosp. Dist. No. 1*, 152 Wn.2d 299, 308, 96 P.3d 957 (2004) (citing *Reninger*, 134 Wn.2d at 450). However, "disparity of relief may be so great that a party would be unlikely to have vigorously litigated the crucial issues in the first forum and so it would be unfair to preclude relitigation of the issues in a second forum." *Christensen*, 152 Wn.2d at 309.

### 2. COLLATERAL ESTOPPEL DID NOT BAR THE CLAIM

The only parts of the test contested here are whether the issues were identical and whether the doctrine would work an injustice against Maytown.

The tort claim of tortious interference with a business expectancy is not identical to any issue heard before the Hearing Examiner. Jury instruction 14 instructed the jury on the elements of tortious interference with a business expectancy. Jury instruction 11 further instructed the jury on the elements of tortious interference with a business expectancy for the Port's claim that the County interfered with MSG's performance under their contract. The County's argument focuses

19

solely on one element of tortious interference: that the County's interference was for an improper purpose or by improper means.

At the April 2011 hearing, the Hearing Examiner did not hear or decide whether the County acted for an improper purpose or by improper means. The hearing involved MSG's proposed amendments to the SUP and whether they "could have been handled administratively via enforcement authority and that no amendment application (administrative or quasi-judicial) was required." Ex. 446, at 30. The Hearing Examiner concluded:

> Because the County Code does not explicitly state criteria establishing whether SUP amendments are administrative or quasi-judicial, the Department exercised discretion in deciding which process applied. Its decision is due substantial deference because the ordinance is unclear, the Department is charged with administration of the ordinance, and the decision is within the Department's expertise.

Ex. 446, at 31. The Hearing Examiner's decision indicated only that the County's decision to send amendments to the Hearing Examiner was within its discretion; it is silent as to the motive behind the use of that discretion. The Hearing Examiner did not hear or decide whether the County acted with an improper purpose or by improper means.

Therefore, because the issues heard by the Hearing Examiner were not identical to the jury's issues, collateral estoppel did not bar the claim. Accordingly, the trial court did not err by refusing to dismiss the claim.

D.  SUMMARY

The County only challenges the tortious interference with a business relationship claim based on LUPA and collateral estoppel arguments. Because we reject those arguments, we affirm the jury's finding of liability and award of damages for the tortious interference claim.

20

III.    SUBSTANTIVE DUE PROCESS—42 U.S.C. § 1983 CLAIM

The County argues that the trial court erred by refusing to dismiss MSG's federal due process claim under 42 U.S.C. § 1983. The County argues that MSG presented insufficient evidence to establish two elements of substantive due process: that the County deprived MSG of a cognizable property interest and that any action by the County shocked the conscience. The County also argues that the issue should not have gone to the jury because its actions "were not shocking to the conscience[,] as a matter of law" and thus, the trial court erred by denying its motion for a new trial. Br. of Appellant at 77.

We disagree and conclude that sufficient evidence existed to support the jury's verdict of a substantive due process violation and that whether the County's actions shocked the conscience was a question for the jury.

A.    SUMMARY JUDGMENT

As an initial matter, the County assigns error to the trial court's denial of its motion for summary judgment to dismiss MSG's substantive due process claim. However, once a trial on the merits is held, we review a pretrial order denying summary judgment only if it involved a question of law. *Johnson v. Rothstein*, 52 Wn. App. 303, 306, 759 P.2d 471 (1988). Here, the trial court denied the County's motion for summary judgment because issues of material fact remained. Therefore, we do not review the trial court's denial of the summary judgment motion.

B.    SUFFICIENCY OF THE EVIDENCE AT TRIAL

1.    LEGAL PRINCIPLES

When reviewing a jury verdict for substantial evidence, we view the evidence in the light most favorable to the nonmoving party. *Gorman v. Pierce County*, 176 Wn. App. 63, 87, 307 P.3d 795 (2013). We cannot substitute our judgment for that of the jury. *Gorman*, 176 Wn. App. at 87.

21

Accordingly, we do not "overturn the jury's verdict unless it is clearly unsupported by substantial evidence, i.e., evidence that, if believed, would support the verdict." *Gorman*, 176 Wn. App. at 87. Further, any "inconsistencies in evidence are matters which affect weight and credibility and are within the exclusive province of the jury." *Herriman v. May*, 142 Wn. App. 226, 232, 174 P.3d 156 (2007).

To prevail on a substantive due process claim, the plaintiff must show as a threshold matter that a state actor deprived it of a constitutionally protected life, liberty, or property interest. *Shanks v. Dressel*, 540 F.3d 1082, 1087 (9th Cir. 2008). 42 U.S.C. § 1983 reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Here, the trial court instructed the jury that proving a substantive due process violation

> requires proof that [MSG] was deprived of rights in a way that *shocks the conscience* or interferes with rights that are implicit in the concept of ordered liberty.
> To prevail on its Substantive Due Process violation claim, [MSG] has the burden to prove by a preponderance of the evidence that:
> 1.     [The County] took action against [MSG] that was not rationally related to a legitimate government purpose; and
> 2.     The action taken was an abuse of power lacking in reasonable justification.

15 CP at 6376 (emphasis added). In addition, the trial court instructed the jury that MSG had to prove: "(1) some person deprived [MSG] of a federal constitutional or statutory right, and (2) that person must have been acting under color of state law." 15 CP at 6375. Neither party appealed these instructions and they are the law of the case. Jury instructions not objected to at trial are treated as the properly applicable law for purposes of appeal, thus, becoming the law of the case.

22

*Roberson v. Perez*, 156 Wn.2d 33, 41, 123 P.3d 844 (2005). As a result, we analyze the issue using the jury instructions which included the shocks the conscience standard.

In addition, we review an order denying a motion for a new trial on the ground that the verdict was contrary to the evidence for an abuse of discretion by the trial court. *Palmer v. Jensen*, 132 Wn.2d 193, 198, 937 P.2d 597 (1997). CR 59(a)(7) allows the trial court to vacate a jury's verdict and grant the moving party a new trial if the trial court finds that "there is no evidence or reasonable inference from the evidence to justify the verdict or the decision, or that it is contrary to law." We review the record in the light most favorable to the nonmoving party to determine whether sufficient evidence supported the verdict. *Palmer*, 132 Wn.2d at 197-98.

### 2. PROPERTY INTEREST

As a threshold issue to asserting a viable substantive due process claim under 42 U.S.C. § 1983, "a plaintiff must prove that the conduct complained of deprived the plaintiff of a cognizable property interest without due process." *Durland*, 182 Wn.2d at 70. "In other words, the plaintiff must identify a property right, show that the state has deprived him or her of that right, and show that the deprivation occurred without due process." *Durland*, 182 Wn.2d at 70.

"'Property' under the Fourteenth Amendment encompasses more than tangible physical property." *Durland*, 182 Wn.2d at 70; U.S. CONST. amend. XIV. The right to use and enjoy land is a property right. *Mission Springs, Inc. v. City of Spokane*, 134 Wn.2d 947, 962, 954 P.2d 250 (1998). Permit holders have a vested property interest. *Rettkowski v. Dep't of Ecology*, 122 Wn.2d 219, 228, 858 P.2d 232 (1993).

Here, MSG had a clear property interest because it had a valid, vested permit. *See Rettkowski*, 122 Wn.2d at 228. MSG had a right to use its property for mining because it acquired the SUP to use the land as permitted. *See Mission Springs*, 134 Wn.2d at 962-63. On appeal, the

23

County also concedes "[MSG] had a property interest in the SUP itself." Br. of Appellant at 69. During closing argument, the County argued to the jury that "[a]n issued permit to use land is a valuable property right protected by the Constitution of the United States and the Constitution of the State of Washington." 19 RP at 3785.

The County misidentifies the property right at issue. The County incorrectly asserted that the property right MSG claims was a right to a certain procedure. The property right MSG actually alleged the County violated is the use of the property as permitted, and that the County used the process and procedures to destroy that property right.

The BOCC's remand on the issue of critical areas continued to delay MSG's ability to use the SUP and begin mining. MSG presented sufficient evidence of its property interest when it presented substantial evidence of its ownership of a valid permit at trial.

### 3. SHOCKING TO THE CONSCIENCE

The County also challenges whether MSG presented sufficient evidence that any action by the County shocked the conscience sufficient to constitute a substantive due process violation. The County argues that its actions were not shocking to the conscience as a matter of law. We disagree.

To prove that BOCC's decision violated its substantive due process rights, MSG had to prove that it possessed a protected property in interest in the SUP and that the BOCC deprived MSG of its rights under the SUP in a way that "shock[ed] the conscience" or "interfere[d] with rights that are implicit in the concept of ordered liberty." 15 CP at 6376 (Instr. 24).

In reference to what constitutes action that "shocks the conscience," the United States Supreme Court noted that the substantive component of the Due Process Clause is violated by executive action only when it "'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 847, 118 S. Ct. 1708,

140 L. Ed. 2d 1043 (1998) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 128, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)). Yet, the Supreme Court has admitted that "the measure of what is conscience shocking is no calibrated yard stick." *Lewis*, 523 U.S. at 847. The Court also made clear that the cases that dealt with abusive executive action always emphasized, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.' . . . [W]e said that the Due Process Clause was intended to prevent government officials 'from abusing [their] power, or employing it as an instrument of oppression.'" *Lewis*, 523 U.S. at 846 (internal quotations omitted) (quoting *Collins*, 503 U.S. at 129, 126).

The trial court granted Maytown's summary judgment motion on the issue of whether the BOCC's decision was arbitrary and capricious. Maytown presented evidence of the BOCC's biases to the interest groups opposed to the mine, and the commissioners' lack of disclosure of their communication with representatives of the interest group. Finally, this arbitrary decision caused a significant delay in MSG's ability to utilize the SUP and begin mining.

Therefore, we conclude that MSG presented substantial evidence to support the jury's verdict that the BOCC's arbitrary and capricious decision and subsequent remand shocked the conscience in a constitutional sense. Further, the trial court did not abuse its discretion by denying the County's motion for a new trial because MSG presented substantial evidence of a substantive due process violation.

## CROSS-APPEAL ANALYSIS

Maytown argues that the trial court erred by granting the County's motion in limine excluding evidence of attorney fees expended in the effort to preserve the SUP and to avoid additional damages at trial. They argue that the American rule, which generally precludes a prevailing party from recovering attorney fees, does not apply in this case. We agree.

25

We review a trial court's ruling on a motion in limine for an abuse of discretion. *Colley v. Peacehealth*, 177 Wn. App. 717, 723, 312 P.3d 989 (2013). An abuse of discretion occurs where the trial court's action is manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons. *Portch v. Sommerville*, 113 Wn. App. 807, 810, 55 P.3d 661 (2002). However, "a court 'would necessarily abuse its discretion if it based its ruling on an erroneous view of the law.'" *State v. Rafay*, 167 Wn.2d 644, 655, 222 P.3d 86 (2009) (quoting *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 339, 858 P.2d 1054 (1993)). "If the trial court abuses its discretion, the error will not be reversible unless the appellant demonstrates prejudice." *Colley*, 177 Wn. App. at 723. "The choice, interpretation, and application of statutes are matters of law reviewed de novo." *Lund v. Benham*, 109 Wn. App. 263, 267, 34 P.3d 902 (2001).

Generally, Washington follows the American rule, which provides that each party in a civil action will pay its own attorney fees and costs unless recovery of attorney fees is allowed by contract, statute, or a recognized ground in equity. *Cosmopolitan Eng'g Grp., Inc. v. Ondeo Degremont, Inc.*, 159 Wn.2d 292, 296-97, 149 P.3d 666 (2006).

Maytown cites *Pleas v. City of Seattle*, 112 Wn.2d 794, 774 P.2d 1158 (1989), for support. In *Pleas*, a developer, Parkridge, sought to build an apartment building, which had opponents in the community. 112 Wn.2d at 796. The Washington Supreme Court found that the City of Seattle, "through its officers, intentionally prevented, blocked, and delayed construction of Parkridge's apartment complex merely because they thought it politically expedient for them to cater to those opposing an apartment house on the property." *Pleas*, 112 Wn.2d at 799 (internal quotation omitted). In addition, the City failed to process Parkridge's application for permits "promptly and diligently and in good faith." *Pleas*, 112 Wn.2d at 799.

> As a result of the City's tortious interference, the court determined that Parkridge had been *damaged* in the total amount of $969,468, which included lost profits, loss

> of favorable financing, increased construction costs due to inflation, the costs of the first EIS which was discarded by the City, and *attorney fees*.

*Pleas*, 112 Wn.2d at 799 (emphasis added). The court awarded attorney fees incurred in defending against the City's actions before litigation began. *Pleas*, 112 Wn.2d at 799.

Maytown also cites to a California Supreme Court insurance bad faith case to support its argument: *Brandt v. Superior Court*, 37 Cal.3d 813, 817, 693 P.2d 796, 798 (1985). The California Supreme Court stated that "[w]hen an insurer's tortious conduct reasonably compels the insured to retain an attorney to obtain the benefits due under a policy, it follows that the insurer should be liable in a tort action for that expense." *Brandt*, 693 P.2d at 798. The court held that those specific attorney fees were recoverable as damages resulting from the tort "in the same way that medical fees would be part of the damages in a personal injury action." *Brandt*, 693 P.2d at 798. Maytown argues that the Washington cases that established the equitable exceptions to the American rule follow this common theme that if the "defendant's actions force the plaintiff into litigation separate from the damages action, the fees incurred in the other action are recoverable."[17] Br. of Resp'ts/Cross-Appellants at 95.

---

[17] Maytown cited to our supreme court's discussion in *Rorvig v. Douglas*, 123 Wn.2d 854, 862, 873 P.2d 492 (1994):

> In malicious prosecution and wrongful attachment or garnishment, we have held attorney fees are recoverable as special damages. In malicious prosecution, it has long been the rule that damages include the attorney fees for the underlying action made necessary by the defendant's wrongful act. Similarly, in wrongful attachment or garnishment actions, and in actions to dissolve a wrongful temporary injunction, attorney fees are a "necessary expense incurred" in relieving the plaintiff of the wrongful attachment or temporary injunction, and are recoverable.

(Internal citations omitted). The Washington Supreme Court held that slander of title was analogous because "[a]ttorney fees incurred in removing the cloud from the title and restoring vendibility are necessary expenses of counteracting the effects of the slander." *Rorvig*, 123 Wn.2d at 863.

Here, the American rule does not bar the attorney fees alleged as damages by Maytown because the fees were not accumulated in the current proceeding. The attorney fees they allege as damages were incurred in seeking the SUP amendment and handling the consequences of the BOCC's arbitrary and capricious decision. Maytown asked to present evidence of the attorney fees incurred in the land use case, not the current case.

We hold that when an intentional tort causes damage that requires legal action to repair the damages, then the attorney fees for the legal action to defend can be considered as damages in a different and subsequent proceeding. This is an evidentiary issue, and Maytown should have had the opportunity to present evidence of the attorney fees from the land use case as damages. We remand for a trial solely on the issue of attorney fees as damages, not as costs or fees incurred in this litigation. Whether any damages were sustained in this respect was an issue for the factfinder.

Therefore, the trial court abused its discretion by granting the County's motion in limine because the American rule did not bar Maytown from presenting evidence of attorney fees accrued as damages before litigation as a matter of law.

## ATTORNEY FEES ON APPEAL

Maytown requests attorney fees on appeal pursuant to 42 U.S.C. §§ 1983, 1988 and RAP 18.1.

RAP 18.1(a) allows a prevailing party to recover attorney fees on appeal if "applicable law grants to a party the right to recover reasonable attorney fees." Maytown bases their request on 42 U.S.C. § 1988, which allows us to award attorney fees to the "substantially prevail[ing] party." *Staats v. Brown*, 139 Wn.2d 757, 781, 991 P.2d 615 (2000). Maytown is the substantially prevailing party in this case.

Accordingly, we grant Maytown's request for appellate costs, including reasonable attorney fees for responding to the County's appeal.

CONCLUSION

We affirm, but remand solely on the issue of attorney fees as Maytown's damages on its tortious interference claim.

_____
Melnick, J.

We concur:

_____
Worswick, J.

_____
Maxa, A.C.J.