

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE AUG 0 9 2018
_____
CHIEF JUSTICE

This opinion was filed for record

at _8 am_ on _August 9, 2018_

_____
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| MAYTOWN SAND AND GRAVEL, LLC, | No. 94452-1 |
| Respondent, | |
| v. | EN BANC |
| THURSTON COUNTY, | |
| Petitioner, | Filed    AUG 0 9 2018 |
| BLACK HILLS AUDUBON SOCIETY and FRIENDS OF ROCKY PRAIRIE, | |
| Additional Defendants, | |
| PORT OF TACOMA, a Washington special purpose district, | |
| Respondent. | |

PORT OF TACOMA, a Washington special purpose district,

Respondent,

v.

THURSTON COUNTY,

Petitioner,

BLACK HILLS AUDUBON SOCIETY and FRIENDS OF ROCKY PRAIRIE,

Additional Defendants,

MAYTOWN SAND AND GRAVEL LLC,

Respondent.

1

GORDON McCLOUD, J.—The Land Use Petition Act (LUPA), chapter 36.70C RCW, bars parties from challenging a local land use decision in state court if the parties fail to exhaust the administrative process. RCW 36.70C.030. The central issue in this case is (1) whether that administrative exhaustion rule applies to all tort claims that arise during the land use decision-making process. The other issues are (2) whether there was sufficient evidence to support the jury's finding of a substantive due process violation under 42 U.S.C. § 1983 (Section 1983); (3) whether an aggrieved party can recover prelitigation, administrative fora attorney fees intentionally caused by the tortfeasor under a tortious interference claim; and, lastly, (4) whether the Court of Appeals erred in awarding a request under RAP 18.1(b) for appellate attorney fees that was not made in a separate section devoted solely to that request.

We affirm the Court of Appeals on all but the third issue. We hold that (1) LUPA's administrative exhaustion requirement does not bar all tort claims, (2) there was sufficient evidence to support the jury's finding that Maytown Sand & Gravel LLC's (Maytown) substantive due process rights were violated under Section 1983, (3) the tortious interference claims pleaded in this case do not authorize recovery of prelitigation, administrative fora attorney fees, and (4) the Court of Appeals did not

2

err in awarding appellate attorney fees under RAP 18.1(b). We therefore affirm in part and reverse in part.

I.    FACTS AND PROCEDURAL HISTORY

In late 2009, Maytown purchased real property in Thurston County from the Port of Tacoma (Port) for the express purpose of operating a mine. The property came with an approved 20-year special use permit (permit) from Thurston County (County) for mining gravel.

That permit was originally issued in 2005 to the previous owner, Citifor, after protracted negotiations with numerous community stakeholders and extensive environmental studies. Because the proposed mining site is located adjacent to one of Washington's largest tracts of prairie-oak-wetland habitat, the proposed project stirred significant opposition from nearby residents, Indian tribes, and environmental conservationists. Trial Ex. (Ex.) 303. The lead environmental group opposing the mine back then was the Black Hills Audubon Society (BHAS). Citifor and BHAS eventually reached an agreement balancing Citifor's mining interest with BHAS's environmental concerns. In exchange for BHAS dropping its opposition to the mine, Citifor agreed to significantly reduce the amount of gravel it originally planned to excavate, to reclaim the property as a wetland once the reduced gravel amount was

excavated, and to sell over 800 acres of other property it owned to the state for wildlife conservation. Ex. 429.

But in 2006, the year after the permit was issued and before mining activities began, Citifor sold the property with the permit to the Port. The issues in this case arose four years later when Maytown and the Port sought to use the permit. Even though BHAS had signed off on the permit, other conservation groups and local residents remained opposed to the mine. Maytown and the Port claim that the County's board of commissioners (Board) succumbed to political pressure from these mine opponents and directed the County's Resource Stewardship Department (Department) to impose unnecessary procedural hurdles meant to obstruct and stall the mining operation.

Although Maytown already had a permit to mine the property, the Department remained involved because four key issues needed to be addressed. First, the Friends of Rocky Prairie (FORP), an environmental conservation group, was challenging the validity of the permit. Second, two missed water quality testing deadlines listed in the permit needed to be addressed. Third, there was a discrepancy between the water quality monitoring requirements listed in the permit and the corresponding groundwater monitoring plan that needed to be clarified. Fourth, the permit was due for its five-year review before the hearing examiner.

Because the property had been designated by the County as "mineral land of long term commercial significance," the County was obligated to balance the protection of the mineral land with the protection of critical areas. Ex. 429, at 46. As discussed below, the Department's decisions as to each of the four key issues were generally favorable to Maytown and the Port but came after significant delay and expense.

### A. FORP's Claim That the Permit Had Lapsed Due to Inactivity or Noncompliance with the Permit's Water Quality Monitoring Conditions

Sometime in early 2009, local environmental conservationists learned that the Port was planning to sell the property that it had purchased from Citifor as a permitted gravel mine. These individuals formed a group, FORP, to stop the mine. FORP informed the Department that it believed the permit was no longer valid due to three years of nonuse and missed water testing deadlines. Ex. 140, at 1-2 (citing THURSTON COUNTY CODE (TCC) 20.54.040(4)(A); TCC 17.20.150(C)). FORP acknowledged that the Port had engaged in some activities during those three years but argued that none of those activities counted as use. According to FORP, those activities did not count because the Port was operating outside of its geographical region and outside the scope of its interlocal agreement with the Port of Olympia, the governmental body that had geographical jurisdiction over the property. *Id.*

The Department dismissed FORP's claim as untimely. The Department explained that it had already ruled the year before, in 2008, that the permit was valid despite the missed testing deadlines and the long period of inactivity. Exs. 141, 143. Because FORP failed to challenge that decision within the time frame for such appeals, the Department determined that FORP was time barred from doing so now.

After this legal challenge failed, FORP decided to put political pressure on the mine instead. FORP informed the Port of Olympia Commission of its belief that the Port was acting outside the scope of the interlocal agreement between the two ports. Olympia Port Commissioner George Barner Jr. agreed with FORP that the Port was acting outside the scope of the interlocal agreement and shared his assessment with the Board. Clerk's Papers (CP) at 255-56. FORP also met privately with the Board's three commissioners to discuss the gravel mine. Exs. 98A, 98B; CP at 2213.

Around the same time as these private meetings, one of the Board's commissioners, Karen Valenzuela, indicated interest in evaluating whether the permit could be revoked either because of the reasons raised by FORP or for some other yet-to-be-identified reason. Ex. 114A. Valenzuela also advised Sharron Coontz (FORP's president) about the evidence that she believed was needed to persuade the Board's two other commissioners to agree to reexamine the validity of the permit. Ex. 74.

As discussed in more detail in the five-year review section *infra* Section I.C, the Board ultimately agreed with the Department that the issue of permit validity was closed and could not be reopened by FORP. CP at 106-10.

### B. Maytown's Journey To Extend the Permit's Water Testing Deadlines and To Clarify the Scope of the Water Quality Monitoring Requirements

Even though the Department had already ruled in 2008 that the gravel mining permit had not lapsed entirely due to inactivity or missed water testing deadlines, there was still the issue of how to address those missed deadlines.

When the permit was originally issued in 2005 to Citifor, that company had planned to start mining immediately. As a result, the permit contained deadlines that assumed an immediate start date. Specifically, condition 6A required field testing of 4 off-site supply wells "[p]rior to any mining activity and *within one-year* of final issuance of the [permit]," and condition 6C required the mine operator to collect "water levels, temperature, and water quality, including measurement of background conditions" data from 17 wells "*within 60 days* of the final issuance by the County of the [permit]." Ex. 302 (emphasis added). Because Citifor changed its mind and decided not to pursue the mine soon after it received the permit, Citifor never conducted that field testing and never collected that water quality data.

Significant debate arose in 2009 about whether those two deadlines needed to be formally extended and what water quality metrics and data collection points needed to be monitored.

### *1. The Department Assured the Port That the Permit Was Valid and That the Port Had Complied with All Water Quality Requirements*

As discussed, the Port purchased the property from Citifor in 2006. The Port purchased the property in partnership with the Port of Olympia for use as a rail-served, intermodal logistics center (i.e., a freight transfer center) for the south Puget Sound region. That meant the Port did not have immediate plans to mine the property, so the Port did not conduct field testing or collect water quality data right away.

But the Port's plan to use the property as a freight transfer center fell through. In 2008, two years after purchasing the property, the Port sought to recoup its losses by selling the property as a permitted gravel site. The Port prepared the property for mining by removing 20 million tons of soil that was contaminated due to Citifor's decades of artillery manufacturing and explosives testing on the property. Additionally, the Port sought assurances from the Department that the permit remained valid despite the missed water testing deadlines and lack of mining activity.

8

The Department assured the Port that the permit remained valid. Ex. 85. But the Department also informed the Port that no on-site activities could begin until the Department received condition 6A and 6C's field testing water quality data. *Id.* The Port immediately collected the data and submitted it to the Department the following month. Upon receipt of that data, the Department confirmed that "all information requested . . . has been submitted" and informed the Port that "[i]t is the property owners' responsibility to ensure the property remains in compliance with all adopted . . . conditions i.e. continual monitoring of the groundwater . . . as required by the [permit]." Ex. 83.

Based on the Department's express assurance that the permit was still valid and its implicit approval to start mining, Maytown agreed to buy the property from the Port. However, before the sale was completed, Maytown sought further assurances from the Department that mining activities could commence quickly after completion of the sale. Maytown presented testimony that Mike Kain, the County's planning manager, verbally reassured it that the permit remained valid, that there were no "skeletons in the closet," and that Maytown could commence mining activities within 30 to 60 days. 10 Verbatim Report of Proceedings (VRP) (June 27, 2014) at 2227. Kain disputes ever telling Maytown that mining activities could commence immediately. Rather, Kain testified that he said the average lead time

9

for the Department to process a request to proceed with mining would take approximately 30 to 60 days. 15 VRP (July 8, 2014) at 3163.

That meeting between Kain and Maytown occurred in late October 2009, around the same time that FORP (the environmental conservation group formed to stop the mine) began meeting in earnest with the Board's three commissioners to invalidate the permit.

> 2. *After Nearly Two Years, the Department Suddenly Notified the Port That a "Letter to Proceed" Was Required before Mining Activities Could Commence*

Shortly after the meeting between Maytown and Kain, the Department informed the Port—for the first time in two years of communications about the anticipated mine—that the Port needed to obtain a "letter to proceed" from the Department confirming that all permit conditions had been satisfied before any mining activities could begin. Ex. 361. The Department further stated that once the Port submitted a request for such a letter, "review will not be initiated" until FORP had the opportunity to "outlin[e] their view of . . . compliance with conditions." *Id.* The Department approximated that review of such a request to proceed would "typically be 30 to 60 days." *Id.*

The Port questioned the sudden need for a letter to proceed, especially since it already had a letter in 2008 that implied the Port had complied with all permit

10

conditions and was authorized to start mining. When the Port questioned the County about the letter to proceed requirement, the County's attorney explained that the requirement was authorized under TCC 17.20.160(A). CP at 1154. That ordinance, however, requires only that gravel extraction miners "submit to either an inspection or . . . a conference before commencing the extraction of mineral resources." TCC 17.20.160(A). The ordinance does not mention anything about a written letter to proceed requirement.

Although the Port remained skeptical about the need for a letter to proceed, it nevertheless submitted a request for that letter two months later on January 4, 2010. CP at 1204-34.

The Department denied the request on February 16, 2010. Ex. 382.

The Department explained that it could not issue a letter to proceed because the Port had not complied with all permit conditions. Ex. 383. The Department identified two main noncompliance issues. The first issue was the missed deadlines for field testing and water data collection under conditions 6A and 6C. Those deadlines, the Department explained, could be easily extended by amending the permit. Because the "minor timeline change" did not "rise to the Hearing Examiner level to attain compliance," it "may be approved by staff." Ex. 383, at 3-4; Ex. 382, at 1. The second issue was the Port's allegedly deficient water data collection. Ex.

11

383. Back in 2008 when the Department first informed the Port that it needed to perform water quality monitoring, the Port collected only *2 data points* (water level and temperature) from *14 wells*. However, condition 6C expressly requires the collection of *4 data points* ("water level, temperature, water quality and background conditions") from "*17* [*wells*]." *Id.* at 3-4 (emphasis added). The Department explained that a "*full* baseline data set" consisting of 4 data metrics from 17 wells was required before mining activities could commence. *Id.* at 4 (emphasis added). Additionally, the County's hydrogeologist recommended that the Port perform additional, more comprehensive and costly, water testing of over 160 other pollutants for at least one year before mining. Ex. 63.

The Port disagreed with the Department's findings of noncompliance and refused to do any additional testing. Ex. 386. It appealed the findings and recommendations to the Board. *Id.* The Port argued that the Department was misreading condition 6C's data collection requirements to require more than was intended. *Id.* The Port acknowledged that the express language of condition 6C could be interpreted to include 4 data metrics from 17 wells but argued that that interpretation produced impossible and costly monitoring requirements that have nothing to do with any possible environmental impacts caused by gravel mining. *Id.*

12

Moreover, the Port argued, such additional testing could delay the mining project for over a year due to Washington's rainy season. *Id.*

The Department explained that the additional comprehensive pollutant testing was needed to test for historical pollutants deposited on the property by Citifor's decades of artillery and ammunitions manufacturing and testing.

Whether the Port's or the Department's interpretation of the scope of condition 6C's water quality monitoring requirements was correct was never resolved because the Port withdrew its appeal to the Board a few months later on July 1, 2010. Ex. 50. The Port withdrew the appeal because Maytown, the company that was buying the property, had agreed under protest to collect the additional 2 data metrics from more wells (but not "17 wells") and agreed to conduct the additional, comprehensive pollutant testing. Maytown agreed to do this additional testing to allow mining to begin.

> 3. *Even though Maytown Agreed to Comply with All of the Department's Recommended Tests, the Department Still Required Formal Amendment of the Permit and Hearing Examiner Approval of the Formal Amendment before Mining Could Commence*

Like the Port, Maytown did not agree with the County's interpretation of the scope of water quality testing required under the permit. Before Maytown eventually agreed to comply with the County's interpretation, Maytown sought to

amend six permit conditions. Regarding conditions 6A and 6C's field and water quality testing, Maytown sought to extend the missed deadlines, reduce the data collection points from 4 to 2 data points, and clarify that the reference to 17 "wells" in the permit was really shorthand for a combination of 17 underground wells and aboveground stations. Ex. 59. In addition to amending conditions 6A and 6C, Maytown sought to amend four other permit conditions relating to the construction of a freeway turn pocket (condition 5), the installation of a noise berm (condition 15), the management of stormwater and erosion (conditions 23 H and I), and the notice requirements to nearby well owners (condition V). *Id.* Maytown submitted its proposed amendments to the Department on April 22, 2010.

Maytown claims that before submitting those six proposed amendments to the Department, it had obtained reassurances from Kain at the Department that the proposed amendments would be treated as minor adjustments and therefore would be reviewed administratively by department staff without referral to a hearing examiner for a quasi-judicial public hearing. 5 VRP (June 20, 2014) at 1354. Kain acknowledged having that conversation with Maytown but testified that he said each of those six amendments would probably qualify individually as minor amendments. 16 VRP (July 9, 2014) at 3312-14. He denied ever saying that those six amendments when proposed together, like Maytown did, would qualify as minor. *Id.*

14

The critical difference between treating an adjustment as minor rather than major is that ground disturbing activities can begin once the Department approves a *minor* adjustment, regardless of whether FORP or any other environmental group appeals the adjustment. Appellant's Pet. for Review at 4. Conversely, if an amendment is classified as a *major* adjustment, all ground disturbing activities must be stayed until all appeals are resolved, which could—and in this case did—result in significant delay. Ex. 55.

On June 17, 2010, two months after Maytown submitted its proposed amendments, the Department informed Maytown that the six proposed amendments were "substantial" and therefore needed to be referred to a hearing examiner. *Id.* at 1.

Maytown tried to expedite the amendment process by withdrawing piecemeal most of its proposed amendments. As mentioned above, by July 1, 2010, Maytown had agreed to comply with all of the Department's data collection requirements and recommendations and had withdrawn every amendment except those related to conditions 6A and 6C. Ex. 50. Maytown did not withdraw its proposed 6A and 6C amendments because it was impossible for Maytown to comply with conditions 6A and 6C as written. 4 VRP (June 19, 2014) at 1156-58. The deadlines for both conditions had passed, and condition 6C's data collection requirements were

impossible to satisfy because they required collecting water data from a nonexistent 17th well.

Maytown's withdrawals and concessions occurred too late. By the time Maytown made these concessions, the Board's attorney had already informed the Department that the Board would no longer allow the Department to administratively grant any adjustments to special use permits—not even minor adjustments. 16 VRP (July 9, 2014) at 3297-300. Kain, the County's planning manager, testified that until that point he had been approving minor adjustments to special use permits—like the one at issue here—for over 22 years. *Id.* at 3301-02.

Approval of Maytown's proposed amendments was further delayed by the Department's determination that a limited SEPA[1] review was necessary before the proposed amendments could be considered by the hearing examiner. Ex. 55. The Department explained that because condition 6A and 6C were SEPA conditions, a limited SEPA review was necessary to amend them. This limited review required Maytown to submit a SEPA checklist. *Id.* Maytown's primary complaint with having to undergo limited SEPA review is that it delayed approval of the proposed amendments even more. Before the proposed amendments could be sent to the

---

[1] State Environmental Policy Act, ch. 43.21C RCW.

hearing examiner for consideration, the Department had to issue SEPA findings. The Department issued those SEPA findings on January 19, 2011—nearly 5 months after Maytown submitted its SEPA checklist and nearly 9 months after Maytown initially submitted its request for amendments.[2]

Notably, Maytown's attorney agreed with the Department that a limited SEPA review was probably required. He argued, instead, that any SEPA finding should have been issued as an *addendum* rather than as a new *threshold* determination. Ex. 405. The critical difference between an addendum and a threshold determination is that a threshold determination is subject to an open public comment period, whereas an addendum is not. WAC 197-11-502(3)(b).

The Department issued a *threshold* determination of mitigated nonsignificance on January 19, 2011. Ex. 446.

---

[2] The County argues that this nine-month gap between Maytown's submission of its request for amendments and the Thurston County Community Planning Division's decision was caused in part by Maytown's piecemeal withdrawal of some of its initial six proposed amendments mid-notice period, which required public notice each time. Resp't/Cross-Appellants' Joint Resp. & Opening Br. at 19. Maytown partially withdrew proposed amendments on July 1 and October 29, 2010. Ex. 446.

> 4. *The Hearing Examiner Ruled That Formal Amendments Were Necessary and That Limited SEPA Review Was Appropriate, but Ruled That the Issuance of a SEPA Threshold Determination Was Inappropriate*

Both Maytown and FORP (the environmental conservation group opposed to the mine) appealed different aspects of the Department's SEPA determinations. *Id.* Maytown agreed with the Department's finding of no significant environmental impact but argued that the finding should have been issued as an addendum, not a threshold determination. *Id.* FORP disagreed with the finding and argued that a full SEPA review, not a limited SEPA review, should have been conducted. *Id.* Thus, three matters were before the hearing examiner in March 2011: (1) FORP's SEPA appeal, (2) Maytown's SEPA appeal, and (3) Maytown's request to amend conditions 6A and 6C.

The hearing examiner rejected FORP's SEPA appeal and agreed with Maytown that a SEPA addendum (rather than a threshold finding) was the correct SEPA procedure. *Id.* But she questioned whether she had the authority to resolve that procedural dispute. *Id.* The hearing examiner also approved Maytown's proposed amendments. *Id.*

But before granting Maytown's proposed amendments, the hearing examiner addressed two other procedural complaints raised by Maytown: (1) that it should not have been required to formally amend conditions 6A and 6C because the issue could

have been dealt with as a noncompliance matter at the five-year review (discussed *infra* Section I.C) and (2) that even if it had to formally amend the conditions, the proposed amendments should have been treated as minor adjustments that the Department could grant administratively.

The hearing examiner disagreed with Maytown on these two procedural points. She ruled that a formal amendment was required and that it was within the Department's discretion to refer Maytown's proposed amendments to her given the scope of the proposed changes to condition 6C's data collection requirements.[3]

---

[3] Because the hearing examiner's ruling on these two procedural matters are central to the County's LUPA administrative exhaustion argument and the parties disagree about the scope of that ruling, we quote it fully:

1. **A[] [permit] amendment was required.** Both [Maytown] and the Port argue that the changes entailed in the instant proposal to amend SUPT-02-0612 [(the gravel mining permit)] could have been handled administratively via enforcement authority and that no amendment application (administrative or quasi-judicial) was required. The Department decided otherwise and its decision has several sources of support. While there are no criteria for "special use amendment" identified in the code, TCC 20.54.030 expressly authorizes the review and approval of "amended special use authorizations." Pursuant to TCC 20.54.015(1), administrative review is allowed for a specified list of special uses. Pursuant to TCC 20.54.015(2), the hearing examiner is the approval authority for any special use not listed, and amended special use authorizations are not included in subsection (1). SUPT-02-0612 itself, at condition T, states that "any expansion or alteration" of the use would require submittal of a new or amended special use permit. Permission to mine was predicated on compliance with water monitoring conditions. Changes in the number and nature of monitoring sites specified in the

19

> 5. *Only the Hearing Examiner's SEPA Rulings, Not Her*
> *Procedural Rulings regarding the Amendment Process, Were*
> *Appealed*

FORP appealed the hearing examiner's refusal to order a full SEPA review to the Board. CP at 411-13.

Maytown did not appeal because Maytown received what it really wanted: amendments to conditions 6A and 6C. But Maytown did not appeal the hearing

---

conditions of permit approval, even if intended to increase consistency with the 2005 Plan [(the groundwater management plan that was drafted in conjunction with the permit)], are still "alterations" to the use as approved. Condition T also reserves to the Department the discretion to decide whether a given amendment requires administrative or quasi-judicial review. At the Five Year Review hearing, the Applicant characterized the proposed changes as "clerical" in nature. The County Code is silent as to clerical corrections to conditions in issued permits. Case law suggests that the County is bound by the permit as issued absent further process. *Chelan County v. Nykreim*, [146] Wn.2d 904[, 52 P.3d 1] (2002).

While it may arguably have been in accordance with County Code for the Applicant's technical non-compliance with water monitoring deadlines to be handled as an enforcement action [at the five-year review], changes to the *nature and number* of required monitoring sites fall less clearly within the scope of enforcement. Because the County Code does not explicitly state criteria establishing whether [permit] amendments are administrative or quasi-judicial, the Department exercised discretion in deciding which process applied. Its decision is due substantial deference because the ordinance is unclear, the Department is charged with administration of the ordinance, and the decision is within the Department's expertise. *Bostain v. Food Exp., Inc.*, 159 Wn.2d 700, 716, 153 P.3d 846 (2007).

Ex. 446, at 30-31 (emphasis added).

examiner's arguably unfavorable rulings regarding the need for formal amendments and limited SEPA review.[4] As already discussed, though, Maytown mainly complained about the Department's decision to refer the proposed water quality amendments to the hearing examiner for review (rather than review them administratively) and the Department's decision to issue a SEPA threshold finding (rather than an addendum). On those points, the hearing examiner agreed with Maytown that those actions were unnecessary, though the hearing examiner did say

---

[4] Maytown's attorney explained the decision not to pursue the appeal as follows:

> As we reviewed our options and the Examiner's Decision to outline the appeal I emailed you about on Saturday, we reconsidered our position. The way the Examiner wrote the Decision, she said the Code was unclear about the process and the County had the option to address the 6A and 6C timing issues either administratively or through the formal [permit] Amendment process. Her language leaves open to us the argument that the County staff, under pressure from FORP and the Commissioners, chose the most burdensome and lengthy approach—the formal [permit] Amendment process and its attendant SEPA process that has taken so long and cost so much. Remember that the record shows the County reversed itself on the process which is further evidence of capricious acts. If we appeal this part of the Examiner's Decision to the [Board], we know the [Board] will rule against us and would likely use language that said the formal [permit] Amendment process was REQUIRED. This would make our damage case more difficult so we have concluded we should not file an appeal of the Examiner's Decision.

Ex. 449.

21

that the Department acted within its discretionary authority when it referred the proposed amendments to her.

Thus, the only issue administratively appealed to the Board was FORP's challenge to the hearing examiner's decision against ordering a full SEPA review. The Board rejected FORP's challenge. CP at 411-13. FORP then filed a LUPA appeal in Thurston County Superior Court, which the superior court dismissed for lack of standing on October 13, 2011. CP at 479-84.

The entire amendment and limited SEPA process, including FORP's SEPA administrative and judicial appeals, took a year and a half. However, as mentioned above, *supra* note 2, some of that delay may have been caused by Maytown's withdrawal of proposed amendments midprocess, which required a new public notice to be issued each time.

C. The Permit's Five-Year Review

While Maytown's request for amendments was pending, the permit became due for a five-year review before the hearing examiner. That review took place on December 6-8, 2010, and the hearing examiner issued her decision on December 30, 2010. Because no mining activities had ever taken place during the first five years of the permit, the parties debated whether the laws of 2005 (the year the permit was issued) or 2010 (the current year) applied and what, if any, additional environmental

testing could be imposed on Maytown at this five-year juncture. The parties also debated whether the hearing examiner had the authority to amend conditions 6A and 6C under its enforcement authority at this preamendment hearing stage given that the remaining proposed amendments related to permit compliance matters.

FORP and other members of the public participated in the five-year review. At the review hearing, FORP re-raised the arguments that it had raised in 2009 that the permit had lapsed due to three years of inactivity and due to missed water quality monitoring deadlines.

> *1. The Hearing Examiner Did Not Address Whether She Had the Authority To Modify Conditions 6A and 6C through Her Enforcement Powers at the Five-Year Review*

As detailed above, Maytown and the Port argued throughout the planning and administrative process that there was no need to formally amend conditions 6A and 6C's missed deadlines or formally clarify the scope of 6C's data collection requirements because the Port had already complied with the gist of those conditions. The Department implicitly acknowledged as much in its 2008 letter. Alternatively, Maytown and the Port argued that if formal amendments were necessary, the amendments should be classified as minor adjustments that could be administratively approved by the Department directly without referral to the hearing examiner. At the five-year review, Maytown raised a second alternative argument:

that the hearing examiner could modify those conditions during the five-year review through her permit enforcement powers rather than wait until the scheduled amendment hearing, which had not yet occurred.

The hearing examiner seemed to agree with Maytown that she could treat the water quality testing issue as a noncompliance matter and modify conditions 6A and 6C at the five-year review stage. Ex. 429. But she did not actually rule on that point, because Maytown and the County asked her not to do so. *Id.* They explained that the public had already been notified that a separate hearing would be held on the proposed amendments, so resolution of that issue at the five-year review could trigger procedural due process complaints by others, thereby fueling even more litigation by mine opponents.

Thus, no ruling on the amendment issue was made at the five-year review. As mentioned above, *supra* Section I.B.4, the hearing examiner eventually approved Maytown's proposed amendments three months later at the amendment hearing.

### 2. The Hearing Examiner Rejected FORP's Argument That the Delay in Collecting Water Quality Data Invalidated the Permit

The hearing examiner disagreed with FORP's argument that the lack of water quality testing in 2006 had frustrated the purpose of the permit, thereby rendering the permit invalid. The hearing examiner instead ruled that the delay was beneficial to the project because the County now had a fresh baseline, closer in time to mining,

24

against which to compare future water samples. She explained that if Citifor or the Port had collected water quality data in 2006, as the permit required, then that information would have grown stale by 2010 and would not have been able to provide the County with any useful baseline to assess ground and surface water changes caused by gravel mining activities. Ex. 429.

### 3. *The Hearing Examiner Rejected the Department's Recommendation That a New Critical Areas Study Be Conducted*

Most of the discussion at the five-year review focused on whether a new critical areas study should be conducted given the five-year delay in mining activities and, if so, which critical areas ordinance (CAO) should apply. When the gravel permit was initially approved in 2005, it was evaluated under the County's 2002 CAO,[5] which was the CAO applicable at the time. Since then, however, the County had amended the CAO—in 2009. The relevant difference between the two ordinances is that the 2009 CAO substantially expanded the definition of what land qualifies as protected prairies and oak habitats. *Id.* Notably, if the 2009 CAO applied, Maytown's permitted mine would be reduced in size by almost a third, from 284 acres to approximately 180 acres. *Id.*

---

[5] Although the ordinance in effect in 2005 was adopted in 1999, well before the 2002 designation, we use that 2002 designation because all the parties refer to it as such.

25

The Department recommended that the hearing examiner order a new critical areas survey under TCC 20.54.040(1). Exs. 14, 15. That provision requires application of current law to "proposed" special use sites. The Department classified Maytown's permitted-but-nonexistent mining operation as such a "proposed" use.

In contrast, Maytown argued that its mining operation was a "permitted" use, which had vested under the 2002 CAO. TCC 17.15.355(A) provides that "[a]uthorization to undertake regulated activities within critical areas or their buffers *shall normally be valid for a period of the underlying permit*," which in this case was 20 years. (Emphasis added.) The Department acknowledged that the 2009 CAO usually would not apply to an existing permit but argued that this case was uniquely different because no mining activities had ever occurred.

The hearing examiner agreed with Maytown that it was not required to redo its critical areas study under the 2009 CAO. She ruled that the Department's argument "lack[ed] common sense." Ex. 429, at 46. She explained that "[i]f adopted, the County's position would have the same effect as requiring mines to re-apply every five years. . . . The time and expense needed to acquire DNR [(Department of Natural Resources)] and DOE [(Department of Ecology)] approvals argues against the County's position. No mining could ever occur under such a

26

paradigm because no operator could afford the costs of reapplying every five years."
*Id.*

The hearing examiner also rejected the Department's alternative recommendation that a new critical areas study be conducted under the 2002 CAO. The Department explained that it was concerned that some critical habitats may have been missed in 2005 when the permit was issued, or some may have developed in the area since then. *Id.* In support of its recommendation for a new critical areas study under the 2002 CAO, the Department cited a state forestry map that listed a possible seasonal stream on the property. Ex. 14.

The hearing examiner concluded that "[t]he record contains no evidence" to believe that any critical areas were missed during the 2005 critical areas study. Ex. 429, at 46. As for the possible seasonal stream, the hearing examiner relied on the testimony from a habitat biologist from the Department of Fish and Wildlife saying that he did not see any evidence of a seasonal stream during his site visit in October 2010. *Id.* at 28. Additionally, the hearing examiner relied on the 2005 SEPA mitigated determination of nonsignificance (MDNS) findings that were entered when the permit was originally issued. Those findings detailed the extensive environmental studies that were conducted on the site from 2002 to 2005 when Citifor initially proposed mining the property for gravel. *Id.* at 46. It was significant

27

to the hearing examiner that "[e]ven the conservation organizations supported the October 2005 MDNS" and "submitt[ed] letters stating that [the MDNS] addressed all their concerns about the . . . permit." *Id.* Moreover, the hearing examiner explained that even if any critical areas had been missed in the 2005 critical areas study, "the County and the Applicant [(Maytown)] [we]re equally bound by the issued permit." *Id.*

FORP, along with BHAS, appealed the hearing examiner's rulings to the Board. The Department did not appeal. The Board issued its decision two months later on March 14, 2011. CP at 106-10.

### 4. The Board Reversed the Hearing Examiner and Ordered a New Critical Areas Study Using the 2002 CAO

The Board rejected most of FORP's arguments, except one. *Id.* The Board rejected FORP's argument that the permit had lapsed. *Id.* The Board also rejected FORP's argument that the mining site was a "proposed" project and therefore subject to the 2009 CAO (which was the Department's primary argument for recommending a new critical areas study). *Id.* at 107. But the Board agreed with FORP (and the Department's alternative argument for a new critical area study) that the mining site should be reinspected for critical areas as defined under the 2002 CAO because there was "undisputed" evidence that critical habitats had developed on the property since the permit was issued. *Id.* The Board explained that reevaluation of critical areas

28

was authorized by the permit itself (rather than the TCC), which required that "'[t]he existing native outwash prairie, wetlands, riparian areas (including streams), and oak woodlands within the applicant's overall 1,613-acre ownership **will be completely avoided and buffered from the proposed activity.**'" *Id.* at 107-08 (alteration in original).

### 5. *The Lewis County Superior Court Reversed the Board's Order for a New Critical Areas Study*

Maytown and the Port objected to conducting a new critical areas study. They appealed the Board's decision to the Lewis County Superior Court. CP at 1-53. The superior court agreed with Maytown and the Port and dismissed the Board's order for a new critical areas study on July 20, 2011. CP at 111-16. The superior court held that the Board's order requiring a full redo of the critical areas study was arbitrary and capricious. CP at 2770.

Even though Maytown and the Port never had to conduct a new critical areas study, the administrative process and judicial appeal took five months and resulted in extra costs to Maytown and the Port in defending against the study at the five-year review hearing and throughout the administrative and judicial appeals.

### D. Maytown's and the Port's Tort Claims against the County

After waiting nearly two years, Maytown finally received a letter to proceed from the Department on November 8, 2011. Ex. 1. Maytown began mining a few

29

months later, but the business venture failed not long thereafter. Because of the terms of their property sale agreement, the Port retained a reversionary interest in the property. The Port was unable to sell the property to any other mining company.

Maytown and the Port blamed the County for the mine's failure and lost property value and filed complaints for damages in Lewis County Superior Court. CP at 488-511 (Maytown), 163-86 (the Port). They argued that the nearly two-year delay in mining operations and the significant costs they incurred during the amendment process and five-year review were intentionally caused by the County. They alleged that the Department was operating under the direction of the Board to stop the mining project and that the Department complied with that direction by imposing onerous water quality testing demands and dragging out the amendment and five-year review processes.

Those efforts, they alleged, included (1) introducing a new "letter to proceed" requirement suddenly in 2009, (2) refusing to process the Port's request for a letter to proceed until after FORP had an opportunity to respond, (3) refusing to honor the Department's 2008 determination that the Port had already complied with all water quality testing requirements, (4) requiring Maytown to conduct extensive and costly water quality testing beyond the four data collection points listed under condition 6C, (5) requiring Maytown to formally amend conditions 6A and 6C, rather than

address its technical noncompliance through enforcement powers, (6) refusing to treat Maytown's proposed amendments as minor adjustments as the Department said it would, and even though the only amendments left at the end were unopposed by the Department, (7) issuing a SEPA threshold determination rather than an addendum, which triggered more appeals, (8) recommending that Maytown undergo a new, costly, and time-consuming critical areas study, which transformed what should have been a short compliance hearing into a protracted three-day hearing, and, lastly, (9) including language in the letter to proceed that Maytown finally received almost two years later stating that the Department could impose additional conditions on the permit at subsequent five-year reviews, which Maytown and the Port contend was meant to scare prospective mining companies away from the property.

Maytown and the Port alleged that together these actions resulted in significant expenses, prevented Maytown from bidding on supply contracts because it did not know when it would ever be able to start mining, delayed the start of mining to the point that the project was no longer economically feasible for Maytown's owners, and cast such a dark cloud over the property that the property was virtually unmarketable as anything other than an environmental conservation site. 13 VRP (July 2, 2014) at 2659-61. They further claimed that the Department's actions were

31

done intentionally at the behest of two board commissioners, Valenzuela and Sandra Romero, to stall and shut down Maytown's mining operation.

In support of these claims, Maytown's attorney, John Hempelmann, testified that when he approached Kain (the County's planning manager) during the amendment process to discuss the many procedural hurdles that the Department was imposing on the mine, Kain admitted that all of these hurdles were put into place at the direction of the Board. Those hurdles included requiring a letter to proceed and delaying review of that request so that FORP could review it, 6 VRP (June 23, 2014) at 1499; classifying Maytown's proposed amendments as major rather than minor adjustments, 4 VRP (June 19, 2014) at 1145-46; and recommending that Maytown redo the critical areas study, 5 VRP (June 20, 2014) at 1269. According to Hempelmann, the County's attorney (distinct from the Board's attorney) told him that both he and Kain were at risk of losing their jobs because they had tried to help the mining project proceed despite the commissioners' directives to stop the project. 4 VRP (June 19, 2014) at 1189.

Indeed, the Port's director testified that he was shocked by Commissioner Valenzuela's blatant desire to stop the mine. He testified that he was present during a board meeting where the mine was discussed. During that meeting, the Department informed the Board that the permitted mine could not be stopped unless there was

an emergency, such as evidence of an endangered butterfly species on the property. 2 VRP (June 17, 2014) at 801; 3 VRP (June 18, 2014) at 893. In response to that information, the director testified that he heard Valenzuela tell the Department to go "'find [her] an emergency.'" 3 VRP (June 18, 2014) at 893-94.

The County's manager, Jack Hedge, also observed that Commissioner Valenzuela had figuratively leaped at the possibility of being able to close the mine when she learned there might be a seasonal stream on the property. He testified that when he met with Valenzuela to discuss FORP's allegation of a seasonal stream, she had a "visceral" response to the allegation and pronounced the allegation as the evidence she needed to require the entire project to be reevaluated under SEPA. 15 VRP (July 8, 2014) at 3067-70. Valenzuela did not, however, seek to unilaterally reopen SEPA based on that allegation because the county manager informed her that he knew for a fact that there was no seasonal stream on the property. *Id.* at 3068-70. Notably, however, the Department raised the possibility of a seasonal stream on the property as a basis for redoing a SEPA review at the five-year review. Whether that basis was merely coincidental or raised at Valenzuela's request was a question of fact for the jury to decide.

Commissioner Valenzuela admitted at trial that she wanted to reopen SEPA review. 8 VRP (June 25 2014) at 1849-50. She also acknowledged that she wanted

the mining project to be classified as a "proposed," rather than a "permitted," use so that the 2009 CAO could be applied, *id.* at 1731. She acknowledged that she wanted to use the 2009 CAO even though she knew the ordinance could not be applied retroactively to permitted projects, *id.* at 1734-35; knew that the cost of a new critical areas study would be borne by Maytown and the Port; and knew that the study would probably result in approximately a 40 percent reduction in mineable property, *id.* at 1736-37. An e-mail that Valenzuela sent to a local resident also suggested that she was not against using the "letter to proceed" process to stall the mine. Ex. 60.

Meanwhile, at the same time the Department was evaluating Maytown's proposed amendments, Commissioner Romero directed staff to "[p]lease find out why staff does not agree with the FORP's attorney" since "[t]his may be key to the whole project." Ex. 47.

Additional evidence showed that neither Valenzuela nor Romero disclosed to the Port or to Maytown that they had signed FORP's 2007 petition to rezone the mine. Ex. 91; 8 VRP (June 25, 2014) at 1865. Both Valenzuela and Romero also presided over the appeals in this case without disclosing their membership in BHAS, the environmental conservation group that originally contested the mine when it was proposed in 2002 through 2005 and that joined FORP in many of its appeals and motions in this case. 8 VRP (June 25, 2014) at 1701, 1788-89, 1884-85. According

34

to Valenzuela, it was "meaningful to [her] that BHAS [was] objecting to the requested amendments, since they [were a] party to the settlement agreement" reached in 2005 that gave rise to conditions 6A and 6C. Ex. 31, at 2. Whether this statement proved Valenzuela was biased in favor of BHAS and against the mine was also a question of fact for the jury to decide.

### E. The County's Motions for Summary Judgment and the Jury's Verdict

Thurston County moved for summary judgment dismissal several times throughout the case. The County argued that the case should be dismissed because Maytown and the Port had failed to exhaust their administrative remedies. CP at 222-23, 1381-1410, 1807-16, 1926-36. Additionally, the County argued that Maytown's Section 1983 due process claim should be dismissed because Maytown failed to prove that it was deprived of a constitutionally protected property interest or that the County had acted in a way that unconstitutionally "shocks the conscience." CP at 206-10, 1398-1401. The trial court disagreed and submitted the case to the jury. CP at 1950-53, 3050-56; 14 VRP (July 7, 2014) at 2882-83.

The jury ruled in favor of Maytown and the Port on all of their claims. The jury found that the County had (1) tortiously interfered with the real estate contract between the Port and Maytown, (2) tortiously interfered with Maytown's business expectancy, (3) made negligent misrepresentations to both the Port and Maytown,

(4) made express assurances to both the Port and Maytown giving rise to a special duty to both, and (5) violated Maytown's substantive due process rights in violation of Section 1983. CP at 6388-91. The jury further found that each of these actions caused damages and awarded a lump sum of $8 million to the Port and $4 million to Maytown. CP at 6391.[6] The award did not include the prelitigation attorney fees Maytown and the Port incurred trying to perfect the permit in the administrative fora. CP at 3622-24. But the trial court did award Maytown $1.1 million in litigation attorney fees for prevailing on its Section 1983 claim. CP at 7551-62.

The trial court reduced the jury verdicts to judgment. CP at 6392-94. The County then moved for judgment as a matter of law and a new trial, CP at 6399-422, which the trial court denied, CP at 7448-49.

> F. The Court of Appeals Affirmed the Jury Verdicts and Remanded the Case for a Damages Trial on Prelitigation, Administrative Fora Attorney Fees

The County appealed from the judgment and the trial court's denial of its postjudgment motion. CP at 7469-79. In its opening brief, the County also assigned

---

[6] Additionally, the trial court ruled that the County acted arbitrarily and capriciously in violation of RCW 64.40.020 in ordering Maytown to conduct a new critical areas study. CP at 2770. But no damages were awarded to Maytown for that claim because the parties agreed that those damages would duplicate damages awarded for other claims. Appellant's Opening Br. at 43.

36

error to the trial court's denial of its earlier summary judgment motions, arguing that the trial court should have dismissed the entire case because Maytown and the Port failed to exhaust the administrative process and because there was no evidence to support Maytown's Section 1983 claim.

Maytown and the Port cross appealed the trial court's exclusion of prelitigation, administrative fora attorney fees as damages. CP at 7482-95.

The Court of Appeals rejected the County's claim that LUPA's administrative exhaustion requirements applied to this tort action and found that Maytown had presented sufficient evidence to support its Section 1983 claim. *Maytown Sand & Gravel, LLC v. Thurston County*, 198 Wn. App. 560, 566-67, 395 P.3d 149 (2017). Regarding Maytown and the Port's request for prelitigation, administrative fora attorney fees, the Court of Appeals agreed that these fees were recoverable as damages and remanded the case for a trial on the amount of those fees. *Id.* at 567. The Court of Appeals also granted Maytown appellate fees and costs under RAP 18.1 and 42 U.S.C. § 1988 for prevailing on its Section 1983 claim. *Id.* at 592-93.

The County petitioned for review. We granted review without limitation. *Maytown Sand & Gravel, LLC v. Thurston County*, 189 Wn.2d 1015, 404 P.3d 480 (2017).

II. ISSUES

    A. Whether LUPA's administrative exhaustion rule, RCW 36.70C.030, applies to all tort claims that arise during the land use decision-making process;

    B. Whether there was sufficient evidence to support the jury's finding of a substantive due process violation under Section 1983 (42 U.S.C. § 1983);

    C. Whether an aggrieved party may claim prelitigation, administrative fora attorney fees that the tortfeasor intentionally caused as damages in a tortious interference claim; and

    D. Whether a request under RAP 18.1(b) for appellate attorney fees under 42 U.S.C. § 1988 must be made in a separate section devoted solely to that request.

III. ANALYSIS

    A. LUPA's Administrative Exhaustion Requirement Does Not Bar All Tort Claims That Arise during the Land Use Decision-Making Process

A party challenging a local land use decision must exhaust local administrative processes before seeking review in the courts. RCW 36.70C.030. That rule is subject to four exceptions. One of those exceptions is for "[c]laims provided by any law for monetary damages or compensation." RCW 36.70C.030(1)(c); *e.g., Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 928, 296 P.3d 860 (2013) (holding LUPA's exhaustion requirement does not apply to inverse condemnation claims for compensation).

The County acknowledges that because Maytown and the Port seek only monetary damages in this case, their action arguably falls within the language of LUPA's damages exception. Appellant's Opening Br. at 54-56; Pet'r's Suppl. Br. at 8-11. The County, however, argues against construing that language so broadly as to allow parties, like Maytown and the Port, to circumvent LUPA's administrative exhaustion requirement simply by seeking damages. To allow a party to do so, the County argues, would create a loophole that completely undermines LUPA's statutory framework.

Maytown and the Port argue that we do not need to address the scope of LUPA's damages exception because they are not challenging a land use decision. They argue that LUPA's exhaustion requirement applies only to actions challenging the validity of a permit or the interpretation of a land use statute or ordinance.[7] They argue that a different rule applies where, as here, the plaintiffs challenge an agency's tortious acts committed during the land use permitting process, rather than the land

---

[7] *E.g., Durland v. San Juan County*, 182 Wn.2d 55, 64-66, 340 P.3d 191 (2014) (dismissing a challenge to invalidate a building permit); *Habitat Watch v. Skagit County*, 155 Wn.2d 397, 407, 120 P.3d 56 (2005) (dismissing a challenge to invalidate a land use deadline extension); *Chelan County v. Nykreim*, 146 Wn.2d 904, 939-40, 52 P.3d 1 (2002) (dismissing a challenge to invalidate a boundary line adjustment); *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 172-73, 4 P.3d 123 (2000) (dismissing a challenge to invalidate a rezone decision); *Applewood Estates Homeowners Ass'n v. City of Richland*, 166 Wn. App. 161, 170-71, 269 P.3d 388 (2012) (dismissing a challenge to invalidate a land use permit amendment).

use decision itself. *See Westmark Dev. Corp. v. City of Burien*, 140 Wn. App. 540, 556, 166 P.3d 813 (2007) (distinguishing between actions challenging the validity of a land use decision and actions challenging the government's bad faith delay in issuing that decision).

We review this statutory interpretation issue de novo. *Post v. City of Tacoma*, 167 Wn.2d 300, 308, 217 P.3d 1179 (2009) (citing *In re Pers. Restraint of Cruz*, 157 Wn.2d 83, 87, 134 P.3d 1166 (2006)). We agree with Maytown and the Port.

LUPA's administrative exhaustion requirement applies to judicial review of "land use decisions." RCW 36.70C.020(1). A "land use decision" is defined as "a final *determination* by a local jurisdiction's body or officer with the highest level of authority to make the determination." RCW 36.70C.020(2) (emphasis added). Although the term "determination" is not statutorily defined, the legislature has provided an illustrative list of actions that could trigger such a "determination." That list includes (a) "[a]n application for project permits or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred or used," (b) "[a]n interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property," or (c) "[t]he enforcement by a local jurisdiction of ordinances regulating the

improvement, development, modification, maintenance, or use of real property."
RCW 36.70C.020(2)(a)-(c).

Where the legislature uses a general statutory term but provides a list of illustrative examples, we construe the term narrowly, consistent with those examples. Stated differently, "'general terms, when used in conjunction with specific terms in a statute, should be deemed only to incorporate those things similar in nature or "comparable to" the specific terms.'" *State v. Larson*, 184 Wn.2d 843, 849, 365 P.3d 740 (2015) (quoting *Simpson Inv. Co. v. Dep't of Revenue*, 141 Wn.2d 139, 151, 3 P.3d 741 (2000) (quoting *John H. Sellen Constr. Co. v. Dep't of Revenue*, 87 Wn.2d 878, 883-84, 558 P.3d 1342 (1976))).

Applying that principle of statutory construction, we conclude that the term "determination" does not include tortious acts. Tortious acts committed during the land use decision-making process are not similar or comparable to determinations on a permit application, on the applicability of land use ordinances or regulations to property, or on how ordinances and regulations should be enforced. Construing "determination" in this limited manner is also consistent with LUPA's stated purpose, which is to provide landowners with an expedited and uniform process for

obtaining and appealing local land use decisions.[8] RCW 36.70C.010; WASH. STATE

OFFICE OF FIN. MGMT., GOVERNOR'S TASK FORCE ON REGULATORY REFORM: FINAL

REPORT 51 (Dec. 20, 1994). That rationale does not apply to intentional torts

committed during that land use decision-making process.

We therefore hold that LUPA's administrative exhaustion requirement does

not apply to the tort claims raised here. *Accord Woods View II, LLC v. Kitsap*

---

[8] Maytown speculates that the legislature may have enacted LUPA in response to this court's decision in *Lutheran Day Care v. Snohomish County*, 119 Wn.2d 91, 829 P.2d 746 (1992). Answer to Mem. of Amicus Wash. State Ass'n of Mun. Att'ys in Supp. of Pet. for Review at 3. Maytown contends that LUPA was adopted to reverse the holding in *Lutheran Day Care*, which Maytown characterizes as having transformed every land use appeal into a full-blown liability action. *Id. Lutheran Day Care* held that when a court overturns or upholds a local land use decision under the old pre-LUPA writ of certiorari process, that court's decision had preclusive effect on all subsequent claims for damages. 119 Wn.2d at 116-17. As a result, Maytown argues, the writ process became extremely litigious because the process proved or foreclosed subsequent claims for damages.

We can find no evidence that the legislature adopted LUPA with the intent to reverse *Lutheran Day Care* and abolish any preclusive effect administrative land use decisions could have on subsequent actions. And Maytown has not provided us with any. Our research shows that LUPA was enacted in 1995 at the behest of then-Governor Mike Lowry. Governor Lowry identified a need for regulatory reform in land use decisions and created a task force to develop recommendations for such reform. Exec. Order No. 93-06 (Wash. Aug. 9, 1993), https://www.governor.wa.gov/sites/default/files/exe_order/eo_93-06.pdf [https://perma.cc/D7F5-NHLB]. In its report, the task force identified a complex and highly specialized legal landscape that required aggrieved parties to dispute a single land use decision before the administrative board and the courts simultaneously with different periods for filing an appeal. WASH. STATE OFFICE OF FIN. MGMT., GOVERNOR'S TASK FORCE ON REGULATORY REFORM: FINAL REPORT 51, App. A at 17 (Dec. 20, 1994). In order to provide more consistent, predictable, and timely review, the task force recommended a simplified superior court process and a uniform period for appeal. *Id.* Those recommendations were mostly adopted by the legislature.

*County*, 188 Wn. App. 1, 24-25, 352 P.3d 807 (2015) (holding LUPA's exhaustion requirement does not bar tort claims arising from improper governmental delay in processing permits); *Libera v. City of Port Angeles*, 178 Wn. App. 669, 675 n.6, 316 P.3d 1064 (2013) (holding the same rule applies to a tort claim alleging intentional interference with a business expectancy).

Our holding in this case that LUPA does not absolutely bar all tort claims that arise during the land use decision-making process does not necessarily mean that a hearing examiner's interpretation and application of land use statutes and ordinances will never have any preclusive effect on subsequent tort claims. That issue is not presently before us. Contrary to the County's assertion, neither Maytown nor the Port has challenged any of the hearing examiner's land use determinations. Indeed, Maytown and the Port *relied* on the hearing examiner's determination that it was up to the County's "*discretion*" whether to send Maytown's proposed amendments to her for review to support their claim that the County was not required to send the amendments to her. Resp't/Cross-Appellant's Joint Resp. & Opening Br. at 58 (emphasis added) (explaining that "even though the [h]earing [e]xaminer determined . . . that County staff had the discretion to require a hearing examiner amendment process, that determination says nothing about whether the County exercised its discretion for an improper purpose . . . ."). Although they did disagree with the

hearing examiner's conclusion that they were required to formally amend conditions 6A and 6C, the crux of their complaint was not about the need for amendments but, rather, about the need to send the proposed amendments to the hearing examiner for review and the need to issue a threshold determination that subjected the proposed amendments to an open public comment period and further appeals.

### B. Maytown's Section 1983 Civil Rights Claim Was Supported by Sufficient Evidence

The Civil Rights Act, 42 U.S.C. § 1983, establishes a private cause of action for the deprivation of constitutional rights under color of state law. It is well established that acts occurring during the land use decision-making process can form the basis for Section 1983 claims. *E.g.*, *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 119 S. Ct. 1624, 143 L. Ed. 2d 882 (1999) (partial plurality). Such Section 1983 land use claims typically allege either an unconstitutional taking or a substantive due process violation. Here, Maytown alleged a substantive due process violation.

The jury was instructed that a "Substantive Due Process Clause violation occurs when [the] government takes action against a person that is not rationally related to a legitimate government purpose." CP at 6376. It was also instructed that establishing such a violation "requires proof that Plaintiff Maytown Sand and Gravel was deprived of rights in a way that shocks the conscience or interferes with rights

that are implicit in the concept of ordered liberty." *Id.* The jury found in favor of Maytown on its Section 1983 claim. CP at 6390-91.

The County argues that we should reverse the jury verdict due to insufficient evidence. Specifically, the County argues that Maytown failed to prove that (1) it was deprived of a legally protected property right and (2) the County acted in a way that "shocks the conscience."

When reviewing a jury verdict for sufficient evidence, the court "must accept the truth of the nonmoving party's evidence and draw all favorable inferences that may reasonably be evinced." *Lockwood v. AC&S, Inc.*, 109 Wn.2d 235, 243, 744 P.2d 605 (1987) (citing *Levy v. N. Am. Co. for Life & Health Ins.*, 90 Wn.2d 846, 851, 586 P.2d 845 (1978)). The jury's verdict will be upheld "[i]f there is any justifiable evidence upon which reasonable minds might reach conclusions that sustain the verdict . . . ." *Levy*, 90 Wn.2d at 851. We hold that there was sufficient evidence to support the jury's Section 1983 verdict.

> *1. There Was Sufficient Evidence To Prove the County Deprived Maytown of a Constitutionally Protected Property Right*

"'Property' under the Fourteenth Amendment encompasses more than tangible physical property." *Durland v. San Juan County*, 182 Wn.2d 55, 70, 340 P.3d 191 (2014) (citing U.S. CONST. amend. XIV; *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S. Ct. 1148, 71 L. Ed. 2d 265 (1982)). "Protected property

45

interests include all benefits to which there is a "'legitimate claim of entitlement'.'"

*Id.* (quoting *Conard v. Univ. of Wash.*, 119 Wn.2d 519, 529, 834 P.2d 17 (1992)

(quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701,

33 L. Ed. 2d 548 (1972))). It necessarily follows that a permit to mine constitutes a

protected property interest.

At trial, Maytown claimed that it had a vested right (and hence a protected

property interest) in mining its property based on the 2005 permit and the County's

many assurances from 2008 to 2010 that the permit was valid and that the expired

water quality testing deadlines would be extended. The County acknowledged that

Maytown had a valid permit to mine. But it claimed that that right to mine was

conditioned on Maytown obtaining an extension of the permit's water quality testing

deadlines. The County argued that Maytown had no property interest in its permit

until that condition was satisfied. According to the County, unless and until that

occurred, Maytown had no greater property interest in its permit than a land use

applicant has in a requested permit.

But a requested permit does give rise to a cognizable property interest "when

there are articulable standards that constrain the decision-making process." *Id.* at 71

(citing *Wedges/Ledges of Cal., Inc. v. City of Phoenix*, 24 F.3d 56, 62 (9th Cir.

1994)). In other words, a requested permit constitutes a constitutionally protected

property interest "if discretion [to deny the final issuance of the permit] is substantially limited." *Id.* (citing *Braswell v. Shoreline Fire Dep't*, 622 F.3d 1099 (9th Cir. 2010)). The County concludes that this rule does not apply because Maytown was not entitled to the requested extension of conditions 6A and 6C. Thus, according to the County, Maytown had no property right in its permit and no right to mine.

We agree with the County that because the permit contained expired premining conditions that had not been satisfied by those deadlines, the permit by itself was not enough to prove a constitutionally protected interest to mine.

But Maytown did not rely solely on the permit to establish its entitlement to mine. Maytown also relied on two letters from the County. The first letter informed the Port that the permit remained valid, despite the missed water testing deadlines. Ex. 85; CP at 1120. That letter stated, "[T]he Thurston County Development Services Department hereby considers the activities initiated to date to be sufficient to forestall expiration of the subject Special Use Permit at this time. . . . consistent with TCC 20.54.040(4)(a)." *Id.* Although this first letter also said that mining activities could not start "until the groundwater monitoring survey reports (Condition 6.C 10/24/05 MDNS) . . . have been submitted," a second letter said that that premining groundwater report condition had been satisfied. *Id.* Indeed, the

second letter confirmed that "all information requested" in the first letter had been received and explained that it was the Port's "responsibility to ensure the property *remains* in compliance with all adopted [h]earing [e]xaminer conditions ... as required by the [permit]." Ex. 83 (emphasis added).

Those two letters could be interpreted either broadly, as an agency determination that the Port had complied with all of the permit's premining conditions (as Maytown argued), or narrowly, as mere confirmation of receipt of paper work (as the County argued). But we must view the evidence in the light most supportive of the jury's verdict. *Street v. Weyerhaeuser Co.*, 189 Wn.2d 187, 206-07, 399 P.3d 1156 (2017). Those letters, when viewed in the light most favorable to the jury verdict for Maytown, constitute sufficient evidence that Maytown had a protected property right to mine as of 2008 when the Department determined that all premining conditions had been satisfied.

> 2. *Under Controlling Supreme Court Precedent, the Evidence Was Sufficient To Prove That the County's Acts "Shocked the Conscience"*

The County argues that even if Maytown had a constitutionally protected right to mine, it still did not prove a Section 1983 due process violation. According to the County, a due process violation requires governmental action that "shocks the conscience," which the County defines as governmental action lacking any

legitimate governmental purpose. Appellant's Consolidated Reply & Resp. Br. at 37-38. The County argues that this standard requires more than just arbitrary and capricious acts, *id.* at 36; instead, the "official conduct 'must amount to an "abuse of power" lacking any "reasonable justification in the service of a legitimate governmental objective,"'" *id.* at 38 (quoting *Shanks v. Dressel*, 540 F.3d 1082, 1088-89 (9th Cir. 2008) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998))). This standard, the County contends, requires evidence of corruption, bribery, or self-dealing. Pet'r's Suppl. Br. at 16-18.

Essentially, the County argues that Washington's Section 1983 case law is out of step with contemporary United States Supreme Court precedent and decisions from the federal circuit courts, particularly *Lewis*, 523 U.S. 833 (adopting the federal "shocks the conscience" standard); *Onyx Properties LLC v. Board of County Commissioners*, 838 F.3d 1039, 1049 (10th Cir. 2016) (requiring more than "[i]ntentionally or recklessly causing injury through the abuse or misuse of governmental power"), *cert. denied*, 137 S. Ct. 1815 (2017); and *United Artists Theatre Circuit, Inc. v. Township of Warrington*, 316 F.3d 392, 400-02 (3d Cir. 2003) (rejecting "improper motive" as too low of a standard because it would elevate all land use appeals to constitutional challenges since every disappointed developer complains of abuse of authority).

49

We reject the suggestion that Washington's Section 1983 case law is out of sync with the United States Supreme Court's decision in *Lewis*. In fact, Maytown's Section 1983 claim is highly analogous to the Section 1983 claim raised in *Del Monte Dunes*, 526 U.S. 687, decided one year after *Lewis*.

Like Maytown, Del Monte Dunes filed a Section 1983 due process[9] claim, arguing that a local land use agency had deprived it of economic use of its property and that the agency's actions were motivated by improper environmental and political concerns. Del Monte Dunes applied for a permit to develop 37.6 acres for new residential housing. Del Monte Dunes originally proposed building only 344 units, even though local zoning laws permitted up to 1,000 units. *Id.* at 695-96. The city denied the application but said it would accept a reduced proposal of 264 units. *Id.* at 696. But when Del Monte Dunes submitted an application for 264 units, that application was also denied. This time the city said it would approve 224 units. *Id.* But it turned out the city did not mean that either. When Del Monte Dunes reduced

---

[9] We refer to the *Del Monte Dunes* case as a substantive due process case, even though the case actually involved a regulatory takings issue, because the United States Supreme Court treated the case as a substantive due process case and applied the rules governing substantive due process deprivations, not regulatory takings. We know this because the Court analyzed the claim using the "substantially advances" test, which is reserved for substantive due process claims. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 540, 125 S. Ct. 2074, 161 L. Ed. 2d 876 (2005). By contrast, regulatory takings challenges are governed mostly by the multifactor analysis of *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. 2d 631 (1978). *Lingle*, 544 U.S. at 538-39.

the size of its development a second time to 224 units, the city denied that application. *Id.* Del Monte Dunes appealed that denial to the city council, and the city council directed the city to consider 190 units instead. *Id.* But Del Monte Dunes' proposal for 190 units was also denied. *Id.* So, Del Monte Dunes appealed again to the city council. At this second appeal, the city council approved the plan, subject to a few conditions. *Id.* Even though Del Monte Dunes' development plans did not comply with all of the council's conditions, the city's architectural review committee nevertheless recommended that the plans be approved. *Id.* at 697. The city disagreed with the committee's recommendations and denied the plans. Del Monte Dunes appealed that decision to the city council. On Del Monte Dunes' third appeal, the council affirmed the city's denial. *Id.* The city council did not provide any explanation for upholding that denial and refused to extend the deadlines on the existing conditional permit so Del Monte Dunes could revise its plans. Thus, after five years of back and forth with the city, Del Monte Dunes was back to square one, or possibly worse because a sewer moratorium issued by another agency that was critical to the proposed housing development was expiring soon. *Id.* The United States Supreme Court upheld the trial court's decision to send Del Monte Dunes' Section 1983 claim to the jury, even though there was no evidence of corruption, bribery, or self-dealing. *Id.* at 694, 697-98.

Following *Del Monte Dunes*, the evidence in this case is also sufficient to support a Section 1983 claim.

> *3. The County Is Also Barred from Claiming That Maytown Was Required To Prove the County's Acts "Shocked the Conscience" Because the Jury Instructions That It Requested and Obtained Stated a Different Standard*

Another problem with the County's Section 1983 argument is that it is inconsistent with the jury instructions that the County requested and obtained in this case. The trial court instructed the jury that a due process violation can be proved by showing "[Maytown] was deprived of rights in a way that shocks the conscience *or interferes with rights that are implicit in the concept of ordered liberty*." [10] CP at 6376-77 (jury instruction 24) (emphasis added). This means that the jury could have predicated its finding of a due process violation on actions that *either* shocked the conscience *or* interfered with ordered liberty.

The right to an impartial decision-maker is clearly a right "implicit in the concept of ordered liberty." The evidence, when viewed in the light most favorable to the jury verdict, establishes that two of the County's board commissioners deliberately interfered with the impartiality of the Department's decision-making

---

[10] The County does not challenge the jury instruction. Pet'r's Suppl. Br. at 15 ("The jury was correctly instructed . . . ."). That is probably because the County itself requested that instruction. CP at 6104-05.

process. For this additional reason, the record contains sufficient evidence to support the jury finding of a due process violation.

> C. The American Rule Bars Maytown and the Port from Recovering Prelitigation, Administrative Fora Attorney Fees under a Tortious Interference Claim

The trial court barred Maytown and the Port from "introduc[ing] evidence or argument seeking recovery of attorneys' fees and litigation expenses as damages" at trial. CP at 3622-24. The trial court explained its evidentiary ruling was based on the American rule. VRP (June 12, 2014) (Pretrial hearing) at 547-48.

The American rule requires each party to bear its own litigation costs and fees. *King County v. Vinci Constr. Grands Projects/Parsons RCI/Frontier-Kemper, JV*, 188 Wn.2d 618, 625, 398 P.3d 1093 (2017) (citing *Dayton v. Farmers Ins. Grp.*, 124 Wn.2d 277, 280, 876 P.2d 896 (1994)). The primary justification for adopting the American rule is that it encourages aggrieved parties to air their grievances in court. "[S]ince litigation is at best uncertain[,] one should not be penalized for merely defending or prosecuting a lawsuit, and . . . the poor might be unjustly discouraged from instituting actions to vindicate their rights if the penalty for losing included the fees of their opponents' counsel." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 718, 87 S. Ct. 1404, 18 L. Ed. 2d 475 (1967).

The American rule therefore bars courts from awarding attorney fees as *costs*, subject to certain statutory, contractual, and equitable exceptions. Maytown and the Port argue that the American rule does not apply here because they are seeking recovery of prelitigation, administrative fora attorney fees as *damages*, not costs. Alternatively, they argue that they are entitled to recover these fees under the bad faith exception to the American rule.[11]

We review the trial judge's evidentiary rulings for abuse of discretion. *Univ. of Wash. Med. Ctr. v. Dep't of Health*, 164 Wn.2d 95, 104, 187 P.3d 243 (2008) (citing *State v. Myers*, 133 Wn.2d 26, 34, 941 P.2d 1102 (1997)). However the question of whether a party is entitled to an award of attorney fees is reviewed de novo. *Durland*, 182 Wn.2d at 76 (citing *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 86, 285 P.3d 70 (2012)). We hold that the American rule generally bars recovery of such prelitigation, administrative fora attorney fees and that Maytown and the Port have failed to prove any of the exceptions to that general rule apply.

---

[11] Maytown and the Port also argued before the trial court that the ABC exception applied. CP at 7502-05. Maytown and the Port appear to have abandoned that claim on appeal and for good reason. The County did not expose Maytown or the Port to litigation with others so the rule does not apply. *See LK Operating, LLC v. Collection Grp., LLC*, 181 Wn.2d 117, 123, 330 P.3d 190 (2014) (discussing the ABC exception).

*1. Washington's American Rule Bars Recovery of Prelitgation, Administrative Fora Attorney Fees as Damages Except in a Narrow Set of Circumstances Not Applicable Here*

Although "the traditional American rule relates to attorney fees as *costs*, at least two of the recognized equitable exceptions award attorney fees as *damages*." *City of Seattle v. McCready*, 131 Wn.2d 266, 275, 931 P.2d 156 (1997) (listing example cases). Thus, the "more accurate statement of Washington's American rule" is that "attorney fees are not available as *costs or damages* absent a contract, statute, or recognized ground in equity." *Id.*

Maytown and the Port argue that they should have been allowed to present evidence of prelitigation, administrative fora attorney fees as damages because they would not have incurred those fees but for the County's deliberate abusive use of the administrative process. They argue this type of intentional, deliberate abuse of process sets their claim for prelitigation, administrative fora attorney fees apart from other tort claims.

We agree that prelitigation, administrative fora attorney fees may qualify as damages in certain types of abuse of process cases. For example, attorney fees are recoverable as special damages in malicious civil prosecution actions where the fees were necessitated by the defendant's intentional acts. *See Rorvig v. Douglas*, 123 Wn.2d 854, 862, 873 P.2d 492 (1994) (citing *Aldrich v. Inland Empire Tel. & Tel.*

*Co.*, 62 Wash. 173, 176-77, 113 P. 264 (1911)). Attorney fees are also available in abuse of process cases. *E.g.*, *Bellevue Farm Owners Ass'n v. Stevens*, 198 Wn. App. 464, 478-79, 394 P.3d 1018, *review denied*, 189 Wn.2d 1038, 413 P.3d 565 (2017).

But Maytown and the Port did not bring those types of claims. They brought claims of tortious interference with a contract and business expectancy.[12] Whether the reasons for awarding attorney fees as damages in civil malicious prosecution and abuse of process claims extend to tortious interference claims is a question of first impression for this court, but our analysis is guided by prior precedent.[13]

Like malicious civil prosecution and abuse of process claims, a claim of tortious interference with a contractual or business relationship can involve the

---

[12] Maytown and the Port brought other claims, including a Section 1983 claim, but they do not argue that those other claims form a basis for obtaining prelitigation, administrative fora attorney fees. CP at 7496-508.

[13] Maytown and the Port correctly observe that the trial court in *Pleas v. City of Seattle*, 112 Wn.2d 794, 799, 774 P.2d 1158 (1989), awarded prelitigation attorney fees to Pleas as damages for the city of Seattle's tortious interference in the land use permitting process and that we affirmed that award of attorney fees on appeal. But as Maytown and the Port also recognize, the issue of whether prelitigation attorney fees was available as damages for tortious interference claims was not at issue in *Pleas*. Resp'ts/Cross-Appellants' Joint Reply in Supp. of Cross-Appeal at 3. We therefore had no reason to address the issue. "'Where the literal words of a court opinion appear to control an issue, but where the court did not in fact address or consider the issue, the ruling is not dispositive . . . .'" *In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 600, 316 P.3d 1007 (2014) (quoting *ETCO, Inc. v. Dep't of Labor & Indus.*, 66 Wn. App. 302, 307, 831 P.2d 1133 (1992)).

misuse of courts and administrative fora for improper purposes. *Pleas v. City of Seattle*, 112 Wn.2d 794, 803-04, 774 P.2d 1158 (1989) (citing *Top Serv. Body Shop, Inc. v. Allstate Ins. Co.*, 283 Or. 201, 204, 582 P.3d 1365 (1978)). But malicious civil prosecution and abuse of process claims require more than a defendant's ill intent to support an award of attorney fees. "'[T]he mere institution of a legal proceeding even with a malicious motive does not constitute an abuse of process.'" *Sea-Pac Co. v. United Food & Commercial Workers Local Union 44*, 103 Wn.2d 800, 806, 699 P.2d 217 (1985) (quoting *Fite v. Lee*, 11 Wn. App. 21, 27-28, 521 P.2d 964 (1974)). Nor does it constitute malicious civil prosecution.[14] *Petrich v. McDonald*, 44 Wn.2d 211, 221-22, 266 P.2d 1047 (1954).

The tort of abuse of process requires misuse of a judicial proceeding to accomplish an act for which the process was not designed. *Sea-Pac*, 103 Wn.2d at 806 (quoting *Fite*, 11 Wn. App. at 27; RESTATEMENT (SECOND) OF TORTS § 682, at 474 (AM. LAW INST. 1977)). In other words, "'there must be an act after filing suit using legal process empowered by that suit to accomplish an end not within the

---

[14] "Malice," for purposes of a malicious prosecution claim, "'["]may be satisfied by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.["]'" *Orwick v. City of Seattle*, 103 Wn.2d 249, 257, 692 P.2d 793 (1984) (quoting *Bender v. City of Seattle*, 99 Wn.2d 582, 594, 664 P.2d 492 (1983) (quoting *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 502, 125 P.2d 681 (1942))).

purview of the suit.'" *Id.* (quoting *Batten v. Abrams*, 28 Wn. App. 737, 748, 626 P.2d 984 (AM. LAW INST. 1981)). The crucial inquiry in abuse of process claims is therefore "whether the judicial system's process, made available to insure the presence of the defendant or his property in court, has been misused to achieve another, inappropriate end." *Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 963 n.2, 603 P.2d 828 (1979) (citing *Gilmore v. Thwing*, 167 Wash. 457, 459, 9 P.2d 775 (1932); *Rock v. Abrashin*, 154 Wash. 51, 54, 280 P. 740 (1929)).

For that reason, as we explained in *Gilmore*, abuse of process claims are exceptionally rare. In *Gilmore*, we dismissed an abuse of process suit predicated on a prior suit for writ of garnishment despite evidence that the defendant had pursued the writ action out of a malicious desire to sully the plaintiff's reputation and undermine his business. 167 Wash. at 459. We explained that an abuse of process claim could not lie even if the jury found the writ was pursued with malice and for an improper purpose because "if the writ had been rightfully issued, its service upon the [plaintiff's] bank would have been rightful." *Id.* Thus, abuse of process claims are generally limited in Washington to unlawful, quid pro quo situations. An example of one such situation is where a judgment creditor uses the judicial system to sequester wages and property that the creditor knows are legally unattachable, but does so for the improper purpose of harassing and inducing the

debtor to pay the outstanding debt with property that is not legally subject to execution. *Rock*, 154 Wash. at 53.

Like abuse of process cases, claims for malicious civil prosecution are also narrowly circumscribed. A malicious civil prosecution claim in Washington requires proof of a "special injury," which is defined as an ""*injury which is not the necessary result in such suits.*"" *Petrich*, 44 Wn.2d at 217 (quoting *Manhattan Quality Clothes, Inc. v. Cable*, 154 Wash. 654, 657, 283 P. 460 (1929) (quoting *Abbott v. Thorne*, 34 Wash. 692, 694, 76 P. 302 (1904))).

We have previously acknowledged that other jurisdictions have abandoned the element of a special injury in order to broaden the circumstances in which a party may recover for malicious prosecution. *Gem Trading*, 92 Wn.2d at 964; *Petrich*, 44 Wn.2d at 219; *see also* RESTATEMENT (SECOND) OF TORTS § 674 (discussing the tort of wrongful use of civil proceedings).[15] But we declined to join those other jurisdictions and instead reaffirmed that Washington follows a "stricter" and more

---

[15] To the extent we suggested in *Davis v. Cox*, 183 Wn.2d 269, 292, 351 P.3d 862 (2015), that attorney fees may be recoverable as damages under the tort of wrongful use of civil proceedings described in *Restatement (Second) of Torts* § 674, we disavow that suggestion. The issue in *Davis* was the constitutionality of Washington's anti-SLAPP [strategic lawsuits against public participation] statute, RCW 4.24.525. We were not asked to determine whether Washington recognized the tort of wrongful use of civil proceedings; we therefore did not have to consider whether such approach would be consistent with our restrictive view on abuse of process and malicious civil prosecution claims.

"restrictive" approach in malicious civil prosecution cases. *Petrich*, 44 Wn.2d at 219; *Gem Trading*, 92 Wn.2d at 963-65.

Maytown and the Port's proposal that we expand the American rule to allow parties to seek prelitigation, administrative fora attorney fees as damages in tortious interference cases where the defendant misuses the administrative process to inflict economic harm conflicts with those controlling decisions because it would eliminate the quid pro quo or special injury elements of abuse of process and malicious civil prosecution tort claims. Maytown and the Port have not proved that those controlling decisions are incorrect and harmful. We are therefore bound by principles of stare decisis to apply that precedent. *In re Rights to Waters of Stranger Creek*, 77 Wn.2d 649, 653, 466 P.2d 508 (1970). We hold that Maytown and the Port were not entitled to prelitigation, administrative fora attorney fees as damages for their tortious interference claims.

Having determined that prelitigation, administrative fora attorney fees are not available to Maytown and the Port as *damages*, we next address whether such fees are recoverable under the bad faith exception to the American rule. As discussed below, we hold that they are not.

## 2. *The Bad Faith Exception to the American Rule Does Not Apply to Prelitigation Attorney Fees*

The American rule permits a court to award attorney fees "when doing so is authorized by a contract provision, a statute, or a recognized ground in equity." *Vinci Constr.*, 188 Wn.2d at 625 (citing *Hamm v. State Farm Mut. Auto. Ins. Co.*, 151 Wn.2d 303, 325, 88 P.3d 395 (2004)). We have found equitable grounds in a variety of actions, including insurance coverage cases,[16] surety coverage cases,[17] the ABC rule (*supra* note 11),[18] actions by injured seamen for maintenance and cure payments,[19] and common fund actions.[20] We have also said that attorney fees "*could be awarded* if the prevailing party proved the opposing party acted in bad faith." *Clark v. Wash. Horse Racing Comm'n*, 106 Wn.2d 84, 93, 720 P.2d 831 (1986) (listing cases).

---

[16] *Olympic S.S. Co. v. Centennial Ins. Co.*, 117 Wn.2d 37, 811 P.2d 673 (1991).

[17] *Vinci Constr.*, 188 Wn.2d at 625-26.

[18] *LK Operating*, 181 Wn.2d at 123-24 (citing *Blueberry Place Homeowners Ass'n v. Northward Homes, Inc.*, 126 Wn. App. 352, 358, 110 P.3d 1145 (2005)).

[19] *Clausen v. Icicle Seafoods, Inc.*, 174 Wn.2d 70, 78-79, 272 P.3d 827 (2012) (citing *Vaughan v. Atkinson*, 369 U.S. 527, 82 S. Ct. 997, 8 L. Ed. 2d 88 (1962)).

[20] *Matsyuk v. State Farm Fire & Cas. Co.*, 173 Wn.2d 643, 649-51, 272 P.3d 802 (2012).

Maytown and the Port argue that they are entitled to prelitigation, administrative fora attorney fees under the bad faith exception to the American rule.[21] Resp't/Cross-Appellants' Joint Resp. & Opening Br. at 97-98; Resp'ts/Cross-Appellants' Joint Reply in Supp. of Cross-Appeal at 5-11.

Whether attorney fees should be granted under the bad faith exception depends on "'[*"*]the justice of the cause or the facts and circumstances of the particular case.[*"*]'" *Clark*, 106 Wn.2d at 93 (quoting *State ex rel. Macri v. City of Bremerton*, 8 Wn.2d 93, 113, 111 P.2d 612 (1941) (quoting 14 AM. JUR. *Costs* § 22, at 16 (1938))). An award of attorney fees is proper under the bad faith exception when the fees were incurred as a result of the "intentional and calculated action" of the defendant that "[left] the plaintiff with only one course of action: that is, litigation." *Rorvig*, 123 Wn.2d at 862. In other words, where "the defendants actually know their conduct forces the plaintiff to litigate" and the ability of the plaintiffs to prove actual damages is difficult, an award for attorney fees may be

---

[21] The County argues that Maytown and the Port never raised the bad faith exception before the trial court. Pet'r's Suppl. Br. at 20 n.10. The County is incorrect. *See* CP at 7506 (Maytown and the Port's Joint Suppl. Br. responding to the County's motion in limine regarding recovery of attorney fees as damages) ("Washington Courts recognize that the bad faith of the defendant can justify an award of attorneys' fees as costs of the damages litigation.").

granted. *Id.* "Fairness requires the plaintiff to have some recourse against the intentional malicious acts of the defendant." *Id.*

But we have never applied the bad faith exception to *prelitigation* administrative forum attorney fees. Nor can we find any other jurisdiction that has applied the bad faith exception to that context. In fact, our research shows that all jurisdictions that have considered whether the bad faith exception to the American rule extends to recovery of prelitigation attorney fees have ruled that the answer is no. *E.g.*, *Ring v. Carriage House Condo. Owners' Ass'n*, 2014 VT 127, 198 Vt. 109, 125, 112 A.3d 754; *Lamb Eng'g & Constr. Co. v. Neb. Pub. Power Dist.*, 103 F.3d 1422, 1435 (8th Cir. 1997); *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 73-74, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (Kennedy, J., dissenting, joined by Rehnquist, C.J., and Souter, J.), *Chambers*, 501 U.S. at 60 (Scalia, J., dissenting). They hold that to the extent such prelitigation attorney fees are recoverable, they are recoverable only as *damages* under some type of abuse of civil proceedings claim, not as *costs* or *sanctions* under the bad faith exception.

We agree. The bad faith exception to the American rule arises out of a court's equitable power to regulate and manage the affairs of the court and the parties before it. *See Chambers*, 501 U.S. at 46. Sanctioning parties for prelitigation conduct that occurred *before* the court was involved and *before* litigation was initiated exceeds

the scope of that authority. Compensating aggrieved parties for harm caused by malicious, prelitigation conduct fits more naturally within the meaning of damages and is therefore limited to that context. *Ring*, 198 Vt. at 125. As discussed above, Washington limits the situations in which such prelitigation attorney fees can be recovered as damages, and those situations do not include the tortious interference claims raised in this case.

This limit on *prelitigation* attorney fees does not, however, affect Maytown's request for *appellate* attorney fees. As we discuss next, different rules apply to that request.

### D. The Court of Appeals Did Not Err in Awarding Maytown's Request for Appellate Attorney Fees under RAP 18.1(b)

RAP 18.1 governs the award of appellate attorney fees. RAP 18.1(a) provides that "[i]f applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court, the party must request the fees or expenses as provided in [RAP 18.1], unless a statute specifies that the request is to be directed to the trial court." When making a request for attorney fees, RAP 18.1(b) states, "[t]he party *must devote a section* of its opening brief to the request for the fees or expenses." (Emphasis added.)

Maytown's request for appellate attorney fees encompassed two sentences in its opening brief. Together, these two sentences state, (1) "Maytown is . . . entitled

to damages under 42 U.S.C. § 1983, and attorneys' fees and costs under 42 U.S.C. § 1988 because the County, acting 'under color of any statute, ordinance, regulation, custom, or usage, of any State' subjected Maytown to a 'deprivation of' Maytown's Constitutional right to substantive due process" and (2) "the Court should . . . award costs and attorneys' fees in accordance with 42 U.S.C. §§ 1983 & 1988 and RAP 18.1; and . . . award cost of appeal to Plaintiffs in accordance with RAP 14." Resp't/Cross-Appellants' Joint Resp. & Opening Br. at 78, 98-99.

The Court of Appeals granted Maytown's request for appellate attorney fees. *Maytown*, 198 Wn. App. at 593.

The County argues that Maytown's request for appellate attorney fees was procedurally defective because it did not include a separate section "devote[d]" entirely to the request for attorney fees. RAP 18.1(b).

Maytown argues RAP 18.1 does not apply to a request for attorney fees under Section 1983 and that even if the rule did apply, RAP 18.1 does not require a separate section devoted entirely and exclusively to the request. Alternatively, Maytown argues that the County waived any objection to the form of Maytown's request for appellate attorney fees when it failed to raise that objection in the Court of Appeals.

We review a grant of appellate attorney fees under RAP 18.1 for an abuse of discretion. *In re Marriage of Buecking*, 179 Wn.2d 438, 455, 316 P.3d 999 (2013). But "[t]he interpretation of a court rule presents a question of law that we review de novo." *State v. Stump*, 185 Wn.2d 454, 458, 374 P.3d 89 (2016) (citing *Jafar v. Webb*, 177 Wn.2d 520, 526, 303 P.3d 1042 (2013)). We hold that RAP 18.1 applies to requests for appellate attorney fees under Section 1983 and that Maytown complied with RAP 18.1's requirements. Because we uphold the Court of Appeals' award of appellate attorney fees, we do not address Maytown's alternative argument about waiver.

> ### *1. The Reverse-Erie Doctrine Does Not Bar State Courts from Applying RAP 18.1(b) to Requests for Appellate Attorney Fees under 42 U.S.C. §§ 1983 and 1988*

Maytown argues that RAP 18.1 does not apply to Section 1983 claims for appellate attorney fees. Suppl. Br. of Resp't Maytown Sand & Gravel, LLC at 15-16. Maytown argues that a state court reviewing claims under federal Sections 1983 and 1988 cmust apply federal law, including federal procedural rules. This argument requires us to evaluate the applicability of RAP 18.1(b) under the so-called Reverse-Erie[22] doctrine.

---

[22] "Erie" refers the United States Supreme Court decision in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

The primary concerns of the *Erie* and Reverse-*Erie* doctrines are threefold: encouraging judicial economy, deterring forum shopping, and protecting principles of federalism. "Under *Erie R. Co.* v. *Tompkins*, 304 U. S. 64[, 58 S. Ct. 817, 82 L. Ed. 1188] (1938), when a *federal* court exercises diversity or pendent jurisdiction over *state*-law claims, 'the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court.'" *Felder v. Casey*, 487 U.S. 131, 151, 108 S. Ct. 2302, 101 L. Ed. 2d 123 (1988) (emphasis added) (quoting *Guaranty Trust Co. v. York*, 326 U.S. 99, 109, 65 S. Ct. 1464, 89 L. Ed. 2079 (1945)). The converse of that rule applies under the Reverse-*Erie* doctrine. "Just as federal courts are constitutionally obligated to apply state law to state claims, so too the Supremacy Clause imposes on state courts a constitutional duty 'to proceed in such manner that all the substantial rights of the parties under controlling federal law [are] protected.'" *Id.* (alteration in original) (citation omitted) (quoting *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 245, 63 S. Ct. 246, 87 L. Ed. 239 (1942)).

Under the Reverse-*Erie* doctrine, state courts must apply federal proof standards[23] and federal waiver standards[24] to federal claims and defenses. State courts cannot impose state notice-of-claim requirements[25] or heightened state pleading requirements[26] that burden plaintiffs with having to prove more in state court than they would be required to prove had they brought their federal claims in federal court.

But a state court is generally allowed to apply state *procedural* rules, such as rules defining what trial court orders are immediately appealable, even if those state procedural rules conflict with federal procedural rules of general applicability. *Johnson v. Fankell*, 520 U.S. 911, 921, 117 S. Ct. 1800, 138 L. Ed. 2d 108 (1997). A state procedural rule is generally applicable to federal claims if it is a neutral state rule regarding the administration of the courts that is not meant to interfere with a substantive federal right and allows a party to raise or defend against the federal claim as if in federal court. *Id.* at 919-21.

---

[23] *Cent. Vt. Ry. Co. v. White*, 238 U.S. 507, 512, 35 S. Ct. 865, 59 L. Ed. 1433 (1915).

[24] *Garrett*, 317 U.S. at 249; *Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 361-62, 72 S. Ct. 312, 96 L. Ed. 398 (1952).

[25] *Felder*, 487 U.S. at 138.

[26] *Brown v. W. Ry. of Ala.*, 338 U.S. 294, 298-99, 70 S. Ct. 105, 94. L. Ed. 100 (1949).

RAP 18.1(b) meets all three *Johnson* criteria. It is a neutral court rule governing the general administration of cases. It is not intended to interfere with or substantially alter a party's ability to seek appellate attorney fees in state courts. And it does not require a party to prove more or provide greater notice than that required under federal law. RAP 18.1(b) requires a party requesting appellate attorney fees to do so only in "a separate section" of its opening brief.

> 2. *RAP 18.1(b) Does Not Require a Separate Section Devoted Entirely and Exclusively to the Request for Appellate Attorney Fees*

The County argues that RAP 18.1 requires a separate section devoted entirely and exclusively to the request for appellate attorney fees. The Court of Appeals apparently disagreed, because it granted Maytown's attorney fees request, and we are loath to disturb that court's decision on attorney fees in that court.

That is particularly true here. The County's argument relies essentially on two cases: *Wilson Court Ltd. Partnership v. Tony Maroni's, Inc.*, 134 Wn.2d 692, 710 n.4, 952 P.2d 590 (1998), and *Zuver v. Airtouch Communications, Inc.*, 153 Wn.2d 293, 321 n.21, 103 P.3d 753 (2004).

*Wilson* involved a single sentence request, seeking "recover[y of] its costs and attorneys' fees on appeal," made without citation in the conclusion paragraph of the party's opening brief. Suppl. Br. of Resp't Wilson Court at 14, *Wilson Court Ltd.*

*P'ship v. Tony Maroni's, Inc.*, No. 64766-6 (Wash.), *reprinted in* 13 Briefs 134 Wn.2d (1997). We held that that single, generic sentence in the conclusion paragraph of the brief was insufficient. *Wilson*, 134 Wn.2d at 710 n.4. We explained that "[a]rgument and citation to authority are required under the rule to advise us of the appropriate grounds for an award of attorney fees as costs." *Id.* at 711 n.4 (citing *Austin v. U.S. Bank of Wash.*, 73 Wn. App. 293, 313, 869 P.2d 404 (1994)). Here, Maytown provided more than a single, generic sentence at the end of its brief. Maytown provided two sentences, one at the end and another in the body of its brief. Maytown also provided a legal basis for its request.

The request for appellate attorney fees in *Zuver* more closely matches the request here. In *Zuver*, the request was not made in the conclusion paragraph, and it included the party's basis for seeking attorney fees. The request stated, that "If this Court affirms the trial court's decision, AirTouch requests that the Court award it fees in connection with this appeal pursuant to the Arbitration Agreement." Br. of Resp'ts at 50 n.38, *Zuver v. Airtouch Commc'ns, Inc.*, No. 74156-5 (Wash.), *reprinted in* 4 Briefs 153 Wn.2d (2004). But the request was made in a footnote rather than in the body of the brief. We held that the request was insufficient because "RAP 18.1(b) . . . requires that '[t]he party must devote a section of its opening *brief*

to the request for the fees or expenses.'" *Zuver*, 153 Wn.2d at 321 n.21 (emphasis added) (second alteration in original).

By contrast, Maytown's request for appellate attorney fees under Section 1983 was included in the body (not a footnote) of Maytown's opening brief before the Court of Appeals, in a separate section devoted entirely to arguments under that section, and included the legal basis for the request. The Court of Appeals was certainly entitled to conclude that that sufficed. The request sufficiently apprised the parties and the Court of Appeals of the nature of Maytown's request and the legal basis for it. We therefore affirm the Court of Appeals' award of appellate attorney fees.

IV.    CONCLUSION

The Court of Appeals correctly held that LUPA's administrative exhaustion requirement does not bar the tort claims Maytown and the Port brought in this case. Maytown and the Port challenged the County's tortious acts committed *during* the land use decision-making process, not any particular land use decision itself. The appellate court also correctly held that there was sufficient evidence to support the jury's decision that the County violated Maytown's substantive due process rights. In addition, that court correctly awarded Maytown its appellate attorney fees for prevailing on its Section 1983 claim. The Court of Appeals, however, incorrectly

held that Maytown and the Port were entitled to recover prelitigation, administrative fora attorney fees as damages. We therefore affirm the Court of Appeals in part and reverse in part.

Because Maytown prevailed on its Section 1983 claim in this court, we also grant Maytown's request for appellate attorney fees and costs incurred before this court related to that claim. 42 U.S.C. § 1988; *Jacobsen v. City of Seattle*, 98 Wn.2d 668, 675-76, 658 P.2d 653 (1983) (A prevailing plaintiff under a Section 1983 claim "'should ordinarily recover an attorney's fee [related to that claim] unless special circumstances would render such an award unjust.'" (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263 (1968))).

_[signature]_ Gordon McCloud, J.

WE CONCUR:

_[signature]_ Fairhurst, C.J.

_[signature]_ Stephens, J.

_[signature]_ Johnson, J.

_[signature]_ Wiggins, J.

_[signature]_ Madsen, J.

_[signature]_ González, J.

_[signature]_ Owens, J.

_[signature]_ Yu, J.